934 F.2d 732
 137 L.R.R.M. (BNA) 2569, 119 Lab.Cas. P 10,802
 GENERAL TRUCK DRIVERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS
OF AMERICA, LOCAL NO. 957, Affiliated with the International
Brotherhood of Warehousemen and Helpers of America, AFL-CIO,
Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner.
 Nos. 90-5836, 90-6007.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 10, 1991.
Decided June 10, 1991.
 
 Daniel N. Kosanovich (argued), Logothetis & Pence, Dayton, Ohio, for petitioner cross-respondent.
 Aileen A. Armstrong, Deputy Associate Gen. Counsel, Peter Winkler, Charles P. Donnelly, Jr., David Seid (argued), N.L.R.B., Office of the Gen. Counsel, Washington, D.C., Edward C. Verst, Acting Director and Damon W. Harrison, Jr., N.L.R.B., Region 9, Cincinnati, Ohio, for respondent cross-petitioner.
 Before KRUPANSKY and MILBURN, Circuit Judges, and BERTELSMAN, District Judge*.
 MILBURN, Circuit Judge.
 
 
 1
 Pursuant to 29 U.S.C. Sec. 160(f), petitioner General Truck Drivers, Chauffeurs, Warehousemen and Helpers of America, Local Union 957 ("General Drivers") petitions this court to review and set aside an order by the National Labor Relations Board (the "Board") finding that General Drivers violated section 8(e) of the National Labor Relations Act, 29 U.S.C. Sec. 158(e). The Board cross-petitions for enforcement of the same order. For the reasons that follow, the petition for review is denied and the Board's order is enforced.
 
 I.
 A.
 
 2
 The employer in this case consists of two firms with common ownership and officers which will be referred to collectively as "Northwood." The first is Northwood Stone and Asphalt Company which manufactures crushed stone, concrete and asphalt for highway construction. The second is Northwood Stone & Asphalt, Inc. which is a general contractor engaged in highway construction, including asphalt paving work. Northwood's main office is at Bell Center, Ohio, and it has six asphalt plants in Ohio.
 
 
 3
 During the relevant time period, Northwood adopted and agreed to be bound by a collective bargaining agreement (the "OCA agreement") between the Ohio Contractors Association ("OCA") and the Ohio Conference of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO, with which General Drivers is affiliated. The OCA agreement contained two provisions which are relevant in this matter. Article II, Section 5, provides:5. This Agreement shall govern all forms of construction work which the Contractor performs in the State of Ohio and which comes within the jurisdiction of the Ohio Conference of Teamsters of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and shall apply solely to employees employed directly and exclusively in construction. On site work shall include the hauling of waste material off the job site and shall include hauling of material from one work project to another work project.
 
 
 4
 (Emphasis added).
 
 Article VII, Section 38 provides:
 
 5
 37. All work covered under the scope of this Agreement to be performed on the job site shall be subcontracted only to an employer who is a party to a current, written collective bargaining agreement with the union. In such subcontracts, provision shall be made to require subcontractors to adhere to the conditions of this collective bargaining agreement.
 
 
 6
 (Emphasis added.)
 
 
 7
 In the course of its highway construction work, Northwood often removes old asphalt. By use of specialized machinery, Northwood is able to pulverize the old asphalt product, load it onto dump trucks, and recycle the asphalt product through its plant. This material is referred to as "RAP". Northwood has consistently subcontracted the haulage of RAP to private owner-operators who are not signatory to a collective bargaining agreement. The owner-operators purchase and maintain their own trucks and their own insurance. Owners that have more than one truck hire employees for their other trucks, and, other than licensing and competence standards, Northwood exercises no control over who drives the trucks.
 
 
 8
 Typically, the day of a RAP haulage truck driver is as follows. The drivers line up and take turns loading with RAP off the conveyor belt of the machine which takes up the old asphalt. Once loaded, the driver delivers his load to one of Northwood's asphalt plants.[1] The driver then returns to the jobsite for another load of RAP, sometimes loaded with usable materials. According to Northwood's manager and one of the owner-operators under contract with Northwood, a driver typically spends ten percent of his day loading or waiting to load and ninety percent of his time driving between the jobsite and the plant.
 
 
 9
 On June 3, 1988, General Drivers filed a grievance against Northwood protesting the use of non-union owner-operators to haul RAP. On June 16, Northwood and General Drivers met to discuss the pending grievance. At the meeting, Northwood took the position that the hauling of RAP was not on-site work covered by the OCA agreement because it was a resource to be reused rather than a waste product. General Drivers took the contrary position arguing that RAP was a waste product and that the work was covered by the OCA agreement. During the course of the meeting, General Drivers' representatives stated that they would contact the OCA for its opinion as to whether or not the haulage of RAP was on-site work, and General Drivers expressed an expectation that Northwood would comply with the agreement if OCA found the haulage to be on-site work.
 
 
 10
 On August 24, 1988, the OCA wrote General Drivers a letter stating that the RAP was waste material and that RAP haulage should be considered on-site work. Shortly thereafter, General Drivers forwarded a copy of the OCA letter, along with its own letter, to Northwood. Approximately three weeks after receiving the letter, Northwood notified General Drivers that it would not abide by OCA's determination.
 
 B.
 
 11
 On November 21, 1988, General Drivers filed a complaint in federal district court seeking enforcement of OCA's opinion as an arbitration award. On December 7, 1988, Northwood filed an unfair labor practice charge alleging that General Drivers' attempt to enforce the agreement was a violation of section 8(e) of the Act, 29 U.S.C. Sec. 158(e), which proscribes entry "into any contract or agreement, express or implied, whereby such employer ... agrees ... to cease doing business with any other person...." Pursuant to the Board's motion for injunctive relief pending the resolution of the unfair labor practice charges, and the report and recommendation of a magistrate that the matter should be stayed to allow the NLRB to exercise its primary jurisdiction over labor matters, the district court ordered all court proceedings stayed. The district court's order has not been appealed and is mentioned only for background information.
 
 
 12
 The NLRB issued a formal complaint charging General Drivers with unfair labor practices. After holding a hearing and taking testimony, an ALJ concluded that by attempting to enforce the agreement, the union had violated section 8(e) because the agreement limited subcontracting to union signatories and did not fall within a proviso of section 8(e) allowing "an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction...." (Emphasis added). Other than the facts set out above, the ALJ had before him testimony on behalf of General Drivers to the effect that the language in the contract requiring subcontractors to be signatory to the collective bargaining agreement was included solely for the purpose of preserving jobs for the union membership. The secretary-treasurer of General Drivers and the business agent both testified additionally that the haulage of waste has traditionally and consistently been viewed as "on-site" work.
 
 
 13
 After considering exceptions filed by both the General Counsel of the NLRB and General Drivers, a three-member panel of the Board affirmed the ALJ's findings and conclusions and adopted his recommended order with some modifications as to the remedy. The Board's order required General Drivers to withdraw the grievance and the lawsuit and otherwise cease and desist from trying to enforce the unlawful contractual provisions. This matter is before this court on General Drivers' petition for review and the Board's cross-petition for enforcement.
 
 
 14
 The principal issue presented for review is whether the findings and conclusions of the Board are supported by substantial evidence and have a reasonable basis in law.
 
 II.
 A.
 
 15
 The Board's factual findings and its application of the law to facts is reviewed under the substantial evidence standard. Roadway Express, Inc. v. NLRB, 831 F.2d 1285, 1289 (6th Cir.1987). "Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision.... If the Board errs in determining the proper legal standards, however, we may refuse enforcement on the grounds that the order has 'no reasonable basis in law.' " Id. (quoting Ford Motor Co. v. NLRB, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979)). As the Board is charged with enforcing the Act, courts must accord deference to the Board's interpretation of the Act, and the Board's interpretation will stand if "reasonably defensible." Ford Motor Co., 441 U.S. at 497, 99 S.Ct. at 1849.
 
 B.
 
 16
 Section 8(e) of the NLRA, 29 U.S.C. Sec. 158(e), provides in relevant part:
 
 
 17
 It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to ... cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void: Provided, That nothing in this section shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction...." (Emphasis added.)
 
 
 18
 Section 8(e) was designed to supplement and reinforce the prohibition contained in section 8(b)(4) of the Act, 29 U.S.C. Sec. 158(b)(4), against secondary boycotts by making voluntary agreements to perform what amounted to secondary boycotts themselves illegal. National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 634, 87 S.Ct. 1250, 1263, 18 L.Ed.2d 357 (1967). Thus, the legality of an agreement in question depends upon "whether, under all the surrounding circumstances, the Union's objective was preservation of work for [unit] employees, or whether the agreement [... was] tactically calculated to satisfy union objections elsewhere." National Woodwork, 386 U.S. at 644, 87 S.Ct. at 1268. "The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-a-vis his own employees." Id. at 645, 87 S.Ct. at 1268-69.
 
 
 19
 General Drivers insists that the ALJ, and consequently the Board, erred in failing to determine that the primary purpose of the agreement in this case was to preserve work for its membership, as recited in the 1967-1972 version of the agreement and testified to by its business agent and secretary-treasurer. General Drivers correctly points out that the ALJ did not directly deal with unrefuted testimony that the clause dealing with subcontractors was included for the purpose of work preservation.
 
 
 20
 The principal weakness with General Drivers' position is that if it were allowed to prevail based on the recitation that the agreement was intended to preserve work, then any agreement could be made to withstand a section 8(e) challenge by rote incantation of the correct terminology. Moreover, as General Counsel for the NLRB points out, asphalt recycling is a fairly new procedure dating to 1979, and there is no evidence to show RAP hauling (as opposed to waste hauling) has been done by bargaining unit employees.
 
 
 21
 Respondent General Counsel argues that a sweeping union signatory clause such as the one in this case necessarily is tactically calculated to satisfy union objectives elsewhere, as held by the ALJ. This view finds support not only from the decisions of the NLRB, but also in the appellate courts and treatises. See, e.g., General Drivers, Warehousemen and Helpers Local Union No. 89, 254 NLRB 783, ---- (1981), enforced, 684 F.2d 359 (6th Cir.1982) (per curiam); NLRB v. Chauffeurs, Warehousemen & Helpers Local 525, 773 F.2d 921, 924 (7th Cir.1985) (union signatory clauses "are presumptively invalid"); In re Bituminous Coal Wage Agreements, 756 F.2d 284, 290 (3d Cir.), cert. denied, 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 149 (1985); NLRB v. Hotel and Restaurant Employees and Bartenders' Union Local 531, 623 F.2d 61, 67 (9th Cir.1980) ("[I]t is well-settled that union signatory clauses violate Sec. 8(e)."); NLRB v. National Maritime Union, 486 F.2d 907, 912-13 (2d Cir.1973), cert. denied, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974); Morris, The Developing Labor Law at 1208 (1983); id. at 548 (Supp.1988).
 
 
 22
 The distinction between work preservation clauses and signatory clauses has been explained as follows:
 
 
 23
 Work preservation clauses are generally characterized by the fact that they define the group of permissible subcontractors in terms of economic standards rather than terms of union affiliation.... [A] union signatory clause, [on the other hand], focuses on union affiliation by prohibiting an employer from subcontracting work to any employer not signatory to or approved by the union. Union affiliation or approval bears no absolute relationship to the economic condition of a subcontractor, and clauses requiring such affiliation or approval are directed at more than work preservation--they are generally viewed as an effort to expand the union's sphere of influence by impermissible secondary pressure.
 
 
 24
 Restaurant Employees, 623 F.2d at 67. Given the broad language of the signatory clause in this case, the mere recitation in the agreement that the clause was for the purpose of preserving work and the corroborative testimony of union employees was insufficient to show the clause's "direct relationship to protection of the work of unit employees." General Drivers, 254 NLRB 783, ----.
 
 
 25
 This court's decision in Canada Dry Corp. v. NLRB, 421 F.2d 907 (6th Cir.1970), is not to the contrary. In Canada Dry, this court denied a petition to set aside the Board's determination that an agreement which prevented certain vendors from stocking grocer's shelves was valid under section 8(e). However, the language in that case was narrower in scope providing that "no ... person not covered by this Agreement, shall perform any work customarily performed by employees covered by this Agreement ..." Canada Dry, 421 F.2d at 908. The Board determined that placing stock on shelves was customarily performed by store clerks, with the exception of some brand names. This court agreed that it was "unrealistic to define the area of the clerks' legitimate job protection efforts according to brand name or supplier." Id. at 910.
 
 
 26
 Thus, as the Board and the ALJ determined, the union-signatory clause in this case was illegal unless it was saved by the construction proviso in section 8(e). The ALJ determined that the work was not protected by the construction proviso because:
 
 
 27
 The Board has refused to extend the protection of Section 8(e)'s construction proviso to union signatory clauses which seek to include various types of transportation work including deliveries to, or pick ups from, construction sites. Joint Council of Teamsters No. 42 and its affiliated Local Unions (Associated General Contractors of California, Inc.), 248 NLRB 808, 815-817 (1980). The Board's policy in this regard looks to the legislative history of the proviso which reveals that Congress included the construction industry proviso to "avoid tensions among groups of employees at the same site...." and that Congress exempted transportation to and from job sites from the proviso because employees involved in such work have only "incidental contact with the site." Joint Council of Teamsters, 248 NLRB at 816. With rare exception, the haulage of RAP and other waste by the owner-operators in the instant case involves such "incidental contact" with job sites.
 
 
 28
 Petitioner does not challenge the Board's interpretation of the statutory proviso to exclude delivery work. Rather, petitioner argues that the same analysis which justifies finding delivery work to be off-site requires finding RAP haulage to be on-site in this case. General Drivers goes through a series of alleged distinctions between the haulage of RAP in this case and the delivery of material.
 
 
 29
 Several of these alleged distinctions conveniently ignore parts of the record or findings by the ALJ. For example, General Drivers states that "a driver can spend as much as up to one-half of his time 'on-site' even though dumping may occur off-site...." This statement ignores the ALJ's finding that "drivers hauling RAP spend approximately ninety percent of their work time driving between job site and asphalt plant." General Drivers also states that "[t]he last phase of the employment function, i.e., dumping, may be done on or off-site...." However, the ALJ stated: "In the last three years, Northwood Stone has had approximately 600 jobs involving RAP. In all but two or three of the jobs, the contract drivers hauled the RAP to a Northwood asphalt plant."
 
 
 30
 Other alleged distinctions are devoid of any real difference. For example, General Drivers seeks to capitalize upon the fact that haulage begins on-site and ends off-site whereas delivery of materials begins off-site and ends on-site. However, General Drivers stops short of showing the significance of whether the beginning or ending is on or off-site as long as the principal work activity, i.e., transportation, is performed off-site. Along this same line of thought, General Drivers' attempt to analogize RAP hauling to the work of a machine referred to as a "distributor" is unpersuasive. The distributor performs its only useful function on-site by spraying liquid asphalt onto the road surface as a bonding agent.
 
 
 31
 The case of Joint Council of Teamsters, No. 42 v. NLRB, 702 F.2d 168 (9th Cir.1981), cert. denied, 464 U.S. 827, 104 S.Ct. 100, 78 L.Ed.2d 105 (1983),[2] is persuasive authority for enforcing the Board's order in this case, despite General Drivers' contentions to the contrary. In Joint Council, a master labor agreement between unions and members of the California construction industry prohibited general contractors from hiring non-union dump truck owner-operators. The Board found the agreement to be an unfair labor practice in violation of section 8(e). On a petition to review by the union and a petition to enforce by the NLRB, the court was faced with the question of "whether the Board erred in ruling that the operation of the owner-operated dump trucks in question was not on-site work within the meaning of the Sec. 8(e) proviso." Joint Council, 702 F.2d at 170.
 
 
 32
 The undisputed facts in that case were as follows:
 
 
 33
 The dump truck operators haul materials from construction sites to remote dump sites, from "borrow" pits to construction sites, and from one construction site to another construction site. The truck owners spend most of their time on public roads away from the construction site. The only time spent at the construction site is during loading and unloading, when the dump truck operator ordinarily remains in his vehicle.
 
 
 34
 Id. The truck operators in Joint Council were performing a function much like the truck operators in this case who haul RAP away from the site and asphalt to the site, spending 90 percent of their time on the road. Citing the NLRB opinion underlying Joint Council, 248 NLRB 808 (1980), General Drivers argues that case should be distinguished because it involved the haulage of materials from the jobsite to another jobsite controlled by another contractor. This argument is unpersuasive since the OCA agreement in the present case defines on-site work to include "hauling of material from one work project to another work project." Moreover, by this argument General Drivers attempts to create a distinction similar to the "name brand" distinction this court rejected in Canada Dry, under which the applicability of the agreement would depend on the truck's destination.
 
 
 35
 The court in Joint Council resolved the issue as follows:
 
 
 36
 On these facts, the Board found that the owner-operators are delivery persons, not construction site workers, and therefore their work is not covered by the on-site proviso. That finding is consistent with Board findings in similar cases involving delivery of goods to a construction site. See Drivers Local 695 v. NLRB, 361 F.2d 547, 552 n. 19 (D.C.Cir.1966). In doubtful situations, we give weight to the Board's application of the Act, NLRB v. Denver Building and Construction Trade Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951); where, as here, the situation is not doubtful, we readily enforce the Board's order.
 
 
 37
 702 F.2d at 170. Accord Building Material and Dump Truck Drivers Local 36 v. NLRB, 669 F.2d 759, 762 (D.C.Cir.1981) (independent truck owner-operator hired to operate his dump truck "on a day-to-day basis to haul materials to and from construction sites" was not an employee of the contractor; thus, it was a violation of 8(e) to refuse him work based on his non-signatory status), aff'd, 459 U.S. 344, 103 S.Ct. 665, 74 L.Ed.2d 523 (1983).
 
 
 38
 We agree with the Ninth Circuit's Joint Council decision that independent truckers who spend 90 percent of their time on the road are not on-site workers. While General Drivers makes a colorable argument that the status quo in the industry has been that waste haulage was considered to be on-site work, see Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 662, 102 S.Ct. 2071, 2081, 72 L.Ed.2d 398 (1982) (purpose of the proviso was preservation of the status quo and it was "only partly concerned with jobsite friction"), we perceive two weaknesses in this argument. First, waste haulage and RAP haulage are not necessarily equivalent, as the record demonstrates. Second, rather than directly attacking the Board's reading of the proviso, General Drivers' argument is directed principally at showing that the same Board rationale which supports finding delivery work to be off-site work requires finding waste haulage to be on-site work.
 
 
 39
 Since we reject General Drivers' offered distinctions between RAP haulage and delivery work, in order for this court to reject the Board's decision in this case, we would have to hold that the Board's exclusion of delivery work from the proviso is based on an unreasonable interpretation of the statute. Given General Drivers' failure to directly attack the Board's rationale for excluding delivery work from the protection of the proviso, and considering the longevity of the Board's interpretation and the case law upholding it, even as applied to independent truckers similarly situated with the ones under contract with Northwood, we are unwilling to take that step.
 
 III.
 
 40
 Because the Board's order is based upon a reasonable interpretation of the law and is supported by substantial evidence, the petition for review is DENIED, and the Board's order is ENFORCED.
 
 
 
 *
 Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 On a few occasions when faced with a shortage of trucks, Northwood has stockpiled the RAP and later hauled it to the plant. According to Ron Welch, business representative of General Drivers, the trucks have been observed on two or three occasions dumping the RAP as waste
 
 
 [2]
 A memorandum opinion at 459 U.S. 1193, 103 S.Ct. 1172, 75 L.Ed.2d 424 purports to vacate the judgment at 702 F.2d 168; however, the Supreme Court opinion is dated February 22, 1983, before the amended opinion was issued on March 13, 1983. Therefore, the Supreme Court must have vacated an earlier version of the opinion. Otherwise, there would have been no need to deny certiorari later on October 3, 1983 at 464 U.S. 827, 104 S.Ct. 100, 78 L.Ed.2d 105