RIVERTON COAL COMPANY and Davison Fuel and Dock Company, Plaintiffs-Appellants and Plaintiffs-Appellees,

v.

UNITED MINE WORKERS OF AMERICA, Defendant-Appellee and Defendant-Appellant.

Nos. 71–1021, 71–1022.

United States Court of Appeals,
Sixth Circuit.

Jan. 21, 1972.

J. Mack Swigert, Cincinnati, Ohio, for Riverton Coal Co., et al.; Robert J. Townsend, Cincinnati, Ohio, on brief; Taft, Stettinius & Hollister, Cincinnati, Ohio, of counsel.

Harrison Combs, Washington, D. C., for United Mine Workers; Edward L. Carey, Washington, D. C., E. H. Rayson, Knoxville, Tenn., Robert I. Doggett, Cincinnati, Ohio, M. E. Boiarsky, Charleston, W. Va., on brief.

Before PHILLIPS, Chief Judge, and WEICK and CELEBREZZE, Circuit Judges.

WEICK, Circuit Judge.

Riverton Coal Company (Riverton) and Davison Fuel and Dock Company (Davison) have appealed from a judgment of the District Court dismissing their joint action against United Mine Workers of America (UMW) for recovery of damages under Section 303 of the Labor Management Relations Act of 1947, as amended (29 U.S.C. § 187), because of violations of Section 8(b) (4) and Section 8(e) of the Act.

The case was tried to the Court without a jury. Findings of fact and conclusions of law were adopted, in which the Court held that UMW had not violated the Act, and dismissed the complaint. Because of the difficult nature of the case and the closeness of the questions involved, the Court made findings of fact as to damages against UMW in the amount of $150,312.50, plus interest, for use of the Appellate Court so that the case could be finally disposed of on appeal without remand for retrial on the issue of damages, in the event the judgment was reversed on the issue of liability.

UMW filed a cross-appeal complaining of errors in the findings of fact and conclusions of law adopted by the District Court.

Both Riverton and Davison are corporations; the former is organized under the laws of West Virginia, and the latter under Ohio laws. Riverton was engaged in the business of coal mining and loading river barges on the Kenawha River at Crown Hill and Marmet, West Virginia. Davison had offices at North Bend, Ohio, and was engaged in the business of selling coal. Davison was exclusive sales agent for all of Riverton's mined and purchased coal, receiving a commission ranging from six to eight per cent of the selling price. Riverton was a wholly owned subsidiary of Davison, which kept Riverton's books and records. The capital stock of Davison was closely held and a majority of the stock was owned by the Davison family.

Riverton entered into a collective bargaining agreement with UMW, effective December 1, 1958, which was not subject to termination prior to November 30, 1959, but thereafter either party could

terminate the agreement upon thirty days' written notice to the other.

UMW is an unincorporated labor organization with headquarters in Washington D. C. and a district office in Charleston, West Virginia. It was the exclusive bargaining representative of Riverton's employees, who worked in the coal mines in West Virginia. The employees belonged to Local 1209 of UMW.

It was customary for Riverton to purchase coal to supplement its production to fill orders and to meet market requirements. It operated its own mines to full capacity but could not mine enough coal to meet all of its sales requirements because of limited financial resources and lack of necessary mining equipment.

In 1962–63 Davison sold 2,170,000 tons of coal, of which 44½% was coal which had been purchased by Riverton and Davison from other coal mine operators, some of whom were signatory to UMW agreements and others of whom were not. The base price of coal purchased was the same from all operators, namely, four dollars per ton. Also, the quality of the coal was the same. During nine months prior to April, 1964, 78% of the coal purchased by Riverton was purchased from nonsignatory mines, and 22% was purchased from signatory mines.

Some of the suppliers of coal operated on lands in which Riverton and Davison had no interest; others operated on lands owned by Davison and leased to them by Riverton.

The District Court found that in the fall of 1963 UMW, through District 17, called to plaintiffs' attention "the fact that it was doing business with nonunion operators operating under leases from plaintiff on lands controlled by plaintiff and the purpose was to secure plaintiff's 'help' in organizing these operators in exchange for a Union 'consent' to a business enterprise plaintiff was interested in." Riverton officials did not commit themselves.

In November, 1963, District 17 again contacted Riverton to ascertain what it was doing to force nonsignatory operators to become signatories to a UMW contract. Riverton asked for a list of such operators, which was supplied. It was not claimed that the employees of the nonsignatory operators desired UMW to act as their bargaining representative. Riverton did nothing to induce any of the nonsignatory operators to become signatories.

I

THE 1964 STRIKE

The District Court found that while the 1958 Collective Bargaining Agreement was in full force and effect, UMW, in violation of the terms and provisions thereof, authorized a work stoppage at Riverton's mines commencing on April 10, 1964, which continued until the evening of April 15, 1964. The strike was also a violation of Section 8(d) of the Act.

The Court found that an object of the April 1964 strike was to force or require Riverton to enter into the proposed 1964-form of printed amendment to the National Bituminous Coal Wage Agreement of 1950. The Court further found:

"Another object of the said strike was to force or require Riverton and Davison to cease using, selling, handling, transporting or otherwise dealing in the products of coal producers who were not signatories to an agreement with the defendant Union and to cease doing business with such producers. Another effect of the said strike was to encourage coal producers selling coal to Riverton or Davison to recognize or bargain with the defendant Union as the representative of the employees of such producers even though the defendant Union had not been certified as the representative of such employees under the provisions of Section 9 of the Act. After Riverton signed the 80-cent clause, and as a re-

sult thereof, some fifteen nonunion producers from which Riverton had been buying supplemental coal became signatories to the UMW agreement. Some twenty-two did not—so the effect was not to 'force' or 'compel' but to encourage."

In order to settle the strike and resume operation of its mines, Riverton was forced to sign the National Bituminous Coal Wage Agreement of 1950, as amended, effective April 2, 1964, which it did under protest on April 15, 1964, and UMW then withdrew its pickets and permitted the mines to resume operations.

The 1964 amendment contained the so-called "80-cent penalty clause" and the "coal lands clause", which Riverton objected to as being illegal.[1] The Protective Wage Clause was dropped from the agreement in that year. Prior to the 1964 Amendment signatories were required to pay into the Welfare Fund forty cents per ton of coal produced by them. The purpose of the amendment was to require signatories who procured or purchased from non-signatories soft coal for sale or use, to pay into the Welfare Fund eighty cents per ton of coal so purchased or procured.

In South-East Coal Co. v. Consolidation Coal Co., 434 F.2d 767 at 781 (6th Cir. 1970), we said:

"While the stated purpose of the amendment was to protect work standards by equalizing labor costs between employees of signatories and nonsignatories, the obvious effect was to discourage signatories from purchasing or acting as sale agents for coal companies which produced coal with non-UMW laborers."

The District Court stated that the eighty cent penalty clause and the "coal lands" clause were the "legal" substitutes for the PWC clause in the 1958 agreement after PWC had been held by the National Labor Relations Board to violate Section 8(e) of the Act. Raymond O. Lewis, et al., 144 NLRB 228 (1963).[2]

1. The pertinent provisions of the so-called "80-cent penalty clause" are as follows:
"United Mine Workers of America Welfare and Retirement Fund of 1950
". . . During the life of this agreement there shall be paid into such Fund by each Operator signatory hereto the sum of forty cents (40¢) per ton of two thousand (2,000) pounds on each ton of bituminous coal produced by such Operator for use or for sale. On all bituminous coal produced or acquired by any signatory Operator for use or for sale, (i. e., all bituminous coal other than that produced by such signatory Operator) there shall, during the life of this Agreement, be paid into such Fund by each such Operator signatory hereto or by any subsidiary or affiliate of such Operator signatory hereto the sum of eighty cents (80¢) per ton of two thousand (2,000) pounds on each ton of such bituminous coal so procured or acquired on which the aforesaid sum of forty cents (40¢) per ton had not been paid into said Fund prior to such procurement or acquisition."
In relevant part, the "coal lands clause" read:

"Application of Contract to Coal Lands
"As part of the consideration for this agreement, the Operators signatory hereto agree that this Agreement covers the operation of all the coal lands, coal producing, and coal preparation facilities owned or held under lease by them, or any of them, or by any subsidiary or affiliate, at the date of this Agreement, or acquired during its terms which may hereafter (during the term of this Agreement) be put into production or use . . . ."

2. The ill-fated PWC (Protective Wage Clause) was litigated extensively in this Circuit. Referring to this clause in Tennessee Consol. Coal Co. v. UMW, 416 F.2d 1192 (6th Cir. 1969), cert. denied, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970), we said:
"The record contains an admission by counsel for UMW that the PWC was a 'quid pro quo.' Paragraph A was demanded by BCOA. Paragraph B, containing the promise of the signatory operators, was demanded by UMW. In this paragraph the operators agreed to boycott coal not produced in conformity with the national agreement. UMW

It was the opinion of the District Court that the primary purposes of the eighty cent penalty and the coal land clauses were to protect work opportunities and wages of UMW members and to maintain the integrity of the UMW Welfare and Retirement Fund. Much evidence was offered by UMW on the history of its bargaining and the plight of its members due to competition with other fuels, with a substantial loss of business.

Notwithstanding this, the District Court specifically found that "an object" of the 1964 strike was to force Riverton to sign the agreement containing the eighty cent penalty clause. Another object was to compel Riverton and Davison to cease doing business with, and to cease using the products of, other coal producers who were nonsignatories. The foreseeable purpose of the eighty cent clause was "the unionization of some non-union employers."

■ It is clear that Section 8(b) (4) of the Act forbids strike action if "an object" is to force an employer to do any of the things prohibited by Section 8(e). The statute does not mention primary object or purpose. If any object of the strike is forbidden by Section 8(b) (4), it is a secondary boycott. It is not necessary to find that it was the sole object. N.L.R.B. v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

■ Granting that UMW at all times desired to protect and preserve the work opportunities of its members and their pension fund, which is certainly a worthy motive, this intention does not give UMW a license to violate other laws which violation the District Court found

was an object of the strike. UMW v. Pennington, 381 U.S. 657, 665, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

■ The mandatory provisions of Section 8(b) (4) are just as binding on a labor union as is the Sherman Act. N.L.R.B. v. Denver Bldg. & Const. Trades Council, *supra.*

UMW argues that subcontracting is a bargainable issue, citing Fibreboard Paper Prods. Corp. v. N.L.R.B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). This case is inapposite for it involved the contracting out of maintenance work which was previously performed by the company's employees and such contracting out would have adversely affected them by reason of discharges and layoffs.

In our case, the supplemental coal which Riverton and Davison were purchasing from signatory and nonsignatory suppliers involved work which was never performed by their own employees. Riverton was operating at all times at full capacity, but because of lack of working capital and of mining equipment, it could not run additional mines, and it was necessary for Riverton to purchase coal to fill its orders.

■ The eighty cent penalty clause was not directed at job security, because Riverton could comply therewith by closing its mines, discharging all of its employees, and filling its entire requirements with coal from other signatory mines. Furthermore, Riverton could purchase coal from a signatory mine supplier whose employees were operating under substandard wages and working conditions.

faithfully complied with Paragraph A in all collective bargaining agreements which it entered into. UMW struck operators who refused to agree to the national contract. The record in *Ramsey* is replete with evidence of mass picketing, force and violence." (*Id.,* at 1198).

See also opinion of Circuit Judge O'Sullivan in Ramsey v. UMW, 416 F.2d 655 at 667 et seq. (6th Cir. 1969 en banc),

and cases therein cited which affirmed the judgment of the District Court, by an equally divided court. The Supreme Court reversed the judgment of this court, which reversal was in accord with the views expressed in Judge O'Sullivan's opinion. Ramsey v. UMW, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971).

See also South-East Coal Co. v. Consolidation Coal Co., 434 F.2d 767 (6th Cir. 1970).

The trouble is that the clauses in question here were not "addressed to the labor relations of the contracting employer [Riverton] vis-a-vis his own employees", but on the contrary, to the boycotted employers (nonsignatory suppliers). National Woodwork Mfrs. Ass'n v. N.L.R.B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

■ UMW further contends · that multi-employer collective bargaining is permissible. N.L.R.B. v. Truck Drivers Local 449, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957). But as was observed in UMW v. Pennington, *supra*, there are "limits to what a union or an employer may offer or extract in the name of wages, and because they must bargain does not mean that the agreement reached may disregard other laws." *Id.* 381 U.S. at 665, 85 S.Ct. at 1591.

It should be pointed out that while the 1958 agreement which contained the PWC was negotiated for Riverton by Southern Coal Producers Association (SCPA), Riverton did not permit SCPA to do any negotiating for it thereafter with respect to either the 1964 or 1966 contracts, concerning which it dealt directly with UMW.

■ The 1964 strike was a violation of the 1958 contract which the District Court held contained a "no strike" clause, relying on Lewis v. Benedict Coal Corp., 259 F.2d 346 (6th Cir. 1958), affirmed by an equally divided court, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960).

■ UMW argues that the findings of fact of the District Court that UMW authorized or ratified the 1964 strike, are not supported by substantial evidence and are clearly erroneous. We disagree.

The District Court detailed the evidence to support its findings, which included the conduct of Field Representative Emery McCoy and other UMW agents who, although they knew that the 1958 contract was still in full force and effect, led Riverton employees to believe that they did not have a contract. As these agents well knew, UMW members had a tradition of "no contract, no work." To tell them that they had no contract was the "signal" for them to strike. The strike was settled only when Riverton signed under protest the new agreement containing the eighty cent penalty clause. Thus UMW also ratified the strike. The testimony to the contrary of UMW agents was not credited by the District Court. The testimony of the McCoy's was characterized by the Court as "less than candid."

UMW relies on a decision of the National Labor Relations Board in International Union, UMW et al., 188 NLRB 121 (1971), where the Board by a 3 to 2 vote upheld the eighty-cent clause.

It should be pointed out that the Board has not been consistent in its rulings on either the eighty-cent or the PWC clause. The Board first held that PWC was illegal. Raymond O. Lewis, 144 NLRB 228 (1963). The following year, in a supplemental decision it held the eighty-cent clause illegal. Raymond O. Lewis, et al., 148 NLRB 249 (1964).

The District of Columbia Court of Appeals remanded PWC to the Board for further proceedings. Lewis v. N.L.R.B., 122 U.S.App.D.C. 18, 350 F.2d 801 (D. C.Cir.1965). On remand, the Board reversed itself with Chairman Brown dissenting, and found PWC legal. W. A. Boyle, et al., 179 NLRB 80 (1969). Following the remand ordered in International Union, United Mine Workers of America v. N.L.R.B., 130 U.S.App.D.C. 244, 399 F.2d 977 (1968), and contrary to the recommendations of its trial examiner, the Board in its 3 to 2 decision (and after a change in membership) reversed itself and held that the eighty-cent clause was legal. 188 NLRB 121 (1971).

■ In our view, the Board decisions holding the two clauses to be illegal, appear to be better reasoned decisions. Seven Board members have held the eighty-cent clause invalid. Only three Board members and no trial examiner have held otherwise.

We do not regard the decisions of the Board as controlling on us in damage actions under Section 303. International Longshoremen's and Warehousemen's Union v. Juneau Spruce Corp., 342 U.S. 237, 72 S.Ct. 235, 96 L. Ed. 275 (1952); United Brick & Clay Workers v. Deena Artware Inc., 198 F. 2d 637 (6th Cir. 1952), cert. denied, 344 U.S. 897, 73 S.Ct. 277, 97 L.Ed. 694 (1952), rehearing denied, 344 U.S. 919, 73 S.Ct. 346, 97 L.Ed. 708 (1953); N.L. R.B. v. Deena Artware, 198 F.2d 645 (6th Cir. 1952), cert. denied, 345 U.S. 906, 73 S.Ct. 644, 97 L.Ed. 1342 (1953); Old Dutch Farms Inc. v. Milk Drivers, 281 F.Supp. 971 (E.D.N.Y.1968).

## II

### THE 1966 STRIKE

This strike, like the one in 1964, was also illegal. It violated the provisions of the 1964 "no strike" contract. It violated Section 8(d) of the Act. When the 1966 strike was conducted, the 1964 agreement was in full force and effect. It had not been terminated by either party.

The only way Riverton could terminate the strike was to sign the 1966 amendment to the national contract, which it did under protest. Upon signing it, the strike ended. UMW was successful.

The 1966 contract also contained the illegal eighty-cent penalty clause.

UMW did nothing to persuade its members to return to work other than to send them a telegram. It did not even tell them that they had a valid contract which was being violated by their work stoppage. It did not undertake to discipline the strikers. Its inaction was a form of influence and persuasion. On the other hand, UMW benefited by the strike and took advantage of that fact to get a new contract. I.B.E.W. v. N.L.R. B., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 2d 1299 (1951); Vulcan Material Co. v. United Steelworkers, 430 F.2d 446 (5th Cir. 1970); UMW v. Osborne Mining Co., 279 F.2d 716 (6th Cir.), cert. denied, 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed. 2d 103 (1960).

Local 1209 was not an autonomous labor organization separate and apart from UMW. It was an administrative arm of UMW and was supervised, dominated and controlled by UMW. Under the UMW constitution, UMW had the right "to reverse the action of the Local Union."

It can well be said that UMW, having the power to correct the unlawful action of the Local union, and deciding to accept the benefit of it instead of taking appropriate action to halt the strike as it was required to do under the contract, thereby induced and encouraged both the 1964 and the 1966 strike. Local Union 984, International Bhd. of Teamsters, etc. v. Humko Co., 287 F.2d 231 (6th Cir.), cert. denied, 366 U.S. 962, 81 S.Ct. 1922, 6 L.Ed.2d 1254 (1961).

The findings of fact by the District Court that UMW did not induce or encourage the 1966 strike, and did not thereby violate the Act, are not supported by evidence and are clearly erroneous.

In our opinion UMW was liable to the plaintiffs for all damages proximately resulting from the violations of the Act by UMW.

## III

### DAMAGES

Where liability is established, the plaintiffs are entitled to recover all damages directly and proximately resulting from the violations of the Act by UMW. We have considered the issue of damages in previous cases. Ritchie v. UMW, 410 F.2d 827 (6th Cir. 1969); Riverside Coal Co. v. UMW, 410 F.2d 267 (6th Cir. 1969) and cases therein cited; UMW v. Osborne Mining Co., 279 F.2d 716 (6th Cir.), cert. denied, 364 U. S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103 (1960). The District Court had the benefit of these decisions.

The plaintiffs asserted claims for damages in the amount of $2,587,315,

but they were rejected by the Court except to the extent that the Court allowed them in the amount of $150,312.50, plus interest.

The plaintiffs contend that the damages proposed to be awarded are grossly inadequate. UMW contends that the proposed award is excessive and is not supported by substantial evidence.

In his findings of fact the District Court stated:

"61. The plaintiff's profit-loss damage claims, totalling $2,587,315.00 are rejected except to the extent dealt with above. The claims are based on plaintiff's exhibits 52 and 53 and the testimony relative thereto. The claim broadly amounts to an assertion that an operation which in the sole pre-constraint year (1963) in evidence made $95,000.00 (before taxes etc.) would have made a profit (before taxes etc.) of in excess of $500,000.00 a year over the approximate 4½ years of constraint. This was not a new company—it was long existent. We have mentioned some assumptions leading to the assertion—one more should be mentioned: The plaintiff's loss of profit claim is based on, among other assumptions, the assumption that over 2,000,000 tons of coal, involving dozens of entities and some eleven millions of dollars could and would have involved no increase in administrative expense. That is simply too speculative."

The Court found that plaintiffs had shown that during the period from April, 1962 through 1968, Riverton was unable to fill orders on hand amounting to about 800,000 tons, of which 360,000 tons are applicable to the period April 1, 1964 to April 1, 1966, and the balance of 440,000 tons is applicable to the period April 1, 1966 to September 30, 1968.

The Court then figured that the operating profit (before taxes and nonoperating expenses) was eight cents per ton, basing it on the integrated Davison and subsidiaries' operation for 1963, which was the closest period before the restraint, and it was the only year for which an operating statement was in evidence.

■ It was the theory of plaintiffs that they were entitled to recover the selling price of the supplemental coal less the actual cost and a sales commission. The Court was of the view that the purchase and sale of 800,000 tons of coal over a period of four and one-half years would entail administrative expense. We do not regard this finding as unreasonable. If plaintiffs contend that the Court should have considered years other than 1963, they should have furnished operating statements in support of their contention.

■ The Court allowed $15,000 for settlement of the breach of contract action instituted by Ford Coal Co., (which contract Davison was unable to fulfill because of its inability to acquire the coal) and for attorneys' fees and expenses. The Court was of the view that the settlement of an $850,000-lawsuit for $15,000 was a good settlement.

The Court further allowed damages for unavoidable fixed costs and expenses during the 1964 and 1966 strikes.

Other claims were made by plaintiffs which the Court rejected as speculative.

We do not say that a much larger award could not be sustained. We do hold that the award was within the range of the evidence and we are not inclined to disturb it. This was a difficult case to try, and the District Judge handled it well.

In our opinion, Riverton and its parent corporation Davison are proper parties to bring the action.

The claim of UMW that the award is excessive is clearly without merit.

The judgment of the District Court will be reversed and the cause remanded to the District Court for entry of a judgment in favor of plaintiffs in the amount of $150,312.50, plus interest.