The OHIO VALLEY COAL
COMPANY Plaintiff,

v.

Marty D. HUDSON, et al., Defendants.

No. C2–94–50.

United States District Court,
S.D. Ohio,
Eastern Division.

Jan. 23, 1996.

Thomas A. Smock, David J. Laurent, Michael D. Glass, Polito & Smock, P.C., Pittsburgh, PA, Jonathan R. Vaughn, Vorys, Sater, Seymour and Pease, Columbus, Ohio, for Plaintiff.

Stephen J. Pollak, Wendy S. White, Marty F. Hansen, Shea & Gardner, Washington, DC, Andrew J. Ruzicho, Columbus, Ohio, David W. Allen, Margaret M. Topps, Larry D. Newsome, Washington, DC, for Defendants.

## OPINION AND ORDER

GRAHAM, District Judge.

This action was filed on January 18, 1994 by plaintiff Ohio Valley Coal Company against the trustees of the United Mine Workers of America ("UMWA") 1974 Pension Trust and the UMWA Combined Benefit Fund. Plaintiff is a signatory to the 1988 National Bituminous Coal Wage Agreement ("the Agreement") with the UMWA. Article XX, § (d)(1)(v) of the Agreement contains a provision known as the "purchase-of-coal clause", which requires signatory employers such as plaintiff to contribute a specified monetary amount based upon each ton of coal purchased or acquired from a non-signatory operator to the various UMWA pension and benefit trusts. It is uncontested that plaintiff in fact purchased coal from non-signatory producers during the period of September, 1988 to January, 1993 without making the Article XX, § (d)(1)(v) payments. Plaintiff seeks a declaratory judgment that the purchase-of-coal provision of the Agreement violates § 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e).

■■■ This matter is before the court on the motion for summary judgment of the defendant trustees on the issue of the validity of Article XX, § (d)(1)(v). Defendants contend that this provision is valid on its face and as applied to the circumstances of this case. Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir.1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir.1992) (per curiam). The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case at issue, LaPointe, 8 F.3d at 378, which may be accomplished by pointing out to the court that the nonmoving party lacks evidence to support an essential element of its case. Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d 1382, 1389 (6th Cir.1993). In response, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., 8 F.3d 335, 339–40 (6th Cir.1993). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct.

2505, 2509–10, 91 L.Ed.2d 202 (1986). *See generally Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989).

■ In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir.1993) (quoting *Anderson*, 477 U.S. at 251–53, 106 S.Ct. at 2511–13). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *see Gregory v. Hunt*, 24 F.3d 781, 784 (6th Cir.1994). Finally, a district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir.1994).

Section 8(e) provides in part:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of another employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void....

■ Section 8(e) was enacted to outlaw "hot cargo" clauses through which an employer agrees not to handle non-union material. *National Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. 612, 634, 87 S.Ct. 1250, 1263, 18 L.Ed.2d 357 (1967). Section 8(e) has been construed as applying to other provisions which "might be employed to exert subtle pressures upon employers to engage in 'voluntary' boycotts." *Id.; General Truck Drivers, Chauffeurs, Warehousemen & Helpers of America, Local 957 v. NLRB*, 934 F.2d 732, 735–36 (6th Cir.1991) (Section 8(e) was designed to supplement and reinforce prohibition against secondary boycotts by making voluntary agreements to perform what amounts to a secondary boycott illegal).

■ Section 8(e) reaches only agreements with secondary objectives. *NLRB v. International Longshoremen's Ass'n, AFL–CIO*, 473 U.S. 61, 74, 105 S.Ct. 3045, 3053, 87 L.Ed.2d 47 (1985) ("*ILA II*"); *NLRB v. International Longshoremen's Ass'n, AFL–CIO*, 447 U.S. 490, 504, 100 S.Ct. 2305, 2313, 65 L.Ed.2d 289 (1980) ("*ILA I*"). Agreements fall within the scope of § 8(e) where the objectives of the clause are designed to affect the labor relations of a separate third-party employer and are therefore secondary. *Becker Electric Co. v. IBEW, Local Union No. 212 AFL–CIO*, 927 F.2d 895 (6th Cir. 1991). For example, "union signatory clauses" which prohibit an employer from contracting with other businesses which are not signatories to a labor agreement are invalid under § 8(e) since they are a means of coercing other employers to unionize. *A. Duie Pyle, Inc. v. NLRB*, 383 F.2d 772, 777 (3d Cir.1967). However, § 8(e) does not reach clauses which are designed to affect the relationship between the primary employer and its own employees, so-called primary activities. Thus, § 8(e) does not prohibit work preservation clauses which are designed to pressure an employer to preserve work for its employees which has traditionally been performed by those employees. *National Woodwork*, 386 U.S. at 635, 87 S.Ct. at 1263. Likewise, union standards clauses, which are designed to inhibit the subcontracting of work that would otherwise be performed by members of the bargaining unit, have been upheld as valid under § 8(e). *See, In re Bituminous Coal Wage Agreements*, 756 F.2d 284, 289–90 (3d Cir.1985).

■ The distinction between primary and secondary activity focuses on the intent

of the parties in entering into the agreement. *Becker Electric*, 927 F.2d at 898. The totality of the surrounding circumstances in each case must be examined in determining whether the union's objective was primary in nature, such as work preservation, or whether the agreement was "tactically calculated to satisfy union objectives elsewhere." *National Woodwork*, 386 U.S. at 644, 87 S.Ct. at 1268; *General Truck Drivers*, 934 F.2d at 736. "The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-a-vis* his own employees." *National Woodwork*, 386 U.S. at 645, 87 S.Ct. at 1268. To find that a clause is prohibited, the court must determine that the provision is secondary in its purpose as well as its result. *Bituminous Coal*, 756 F.2d at 290.

 The fact that a clause does not address an issue or problem currently facing the employees of the primary employer at the time of the agreement does not cause it to run afoul of § 8(e). "There need not be an actual dispute with the boycotted employer ... for the activity to fall within" the category of secondary activity "so long as the tactical objective of the agreement and its maintenance is that employer." *National Woodwork*, 386 U.S. at 645, 87 S.Ct. at 1268. In *Meat & Highway Drivers, Dockmen, Helpers & Misc. Truck Terminal Employees, Local Union No. 710 v. NLRB*, 335 F.2d 709 (D.C.Cir.1964), the court addressed a union standards clause which required the primary employer to subcontract work only to companies whose workers enjoyed the same or greater wages and benefits as the employees of the primary employer. The court noted, *Id.* at 716:

> To protect unit work by partially deterring such employer conduct, this clause would at least remove from the employer the temptation of cheap labor through substandard contractors. This is a usual function of a standards clause, ... We need not assume that an employer would use such a tactic as here discussed; it is enough that the union could fear it, and seek such a clause to prevent it.

 The clause at issue here is a purchase-of-coal provision which requires plaintiff to contribute certain amounts to the UMWA pension and benefit funds for each ton of coal purchased from a non-union supplier. This clause has been found to be valid on its face under § 8(e). *See, Bituminous Coal*, 756 F.2d at 291. The parties have stipulated in Paragraph 25 of the Final Pretrial Order ("Order") that the language of the purchase-of-coal clause does not reveal a secondary objective prohibited by § 8(e). The court therefore concludes that the clause is valid on its face. The court must now look to the totality of the evidence presented on summary judgment to determine if a genuine issue of material fact exists on the question of whether the clause as applicable to this case was designed to further or actually achieved a secondary objective.

 Plaintiff's position is that the purchase-of-coal clause is invalid under § 8(e) because plaintiff did not have the production capacity to produce the coal that it purchased. Plaintiff relies on cases which discuss the "right of control" doctrine, the second branch of a two-part test for determining the validity of a work preservation agreement. A valid work preservation clause must first have as its objective the preservation of work traditionally performed by employees represented by the union. *ILA I*, 447 U.S. at 504, 100 S.Ct. at 2313. If this branch is satisfied, the court must then determine whether the employer had the power to give its employees the work in question. *Id.* The rationale of the "right of control" doctrine is that "if the contracting employer has no power to assign the work, it is reasonable to infer that the agreement has a secondary objective, that is, to influence whoever does have such power over the work." *Id.* at 504–05, 100 S.Ct. at 2313–14.

There is no evidence before the court that the coal purchased by plaintiff was of a type, grade or quality that plaintiff could not have produced from its own reserves. There is also no evidence that the type of work required to mine and process the purchased coal was different from the type of work typically performed by plaintiff's union employees. Thus, no genuine issue of fact has been presented in regard to the first branch of the test.

As to the right of control branch, defendants have conceded for purposes of their motion for summary judgment that given all the economic considerations relied on by plaintiff, plaintiff did not have the capacity to produce the quantity or tonnage of coal it purchased from non-signatory operators. Defendants' Memorandum, p. 5, n. 3. Plaintiff argues that this lack of capacity alone is sufficient to render the purchase-of-coal clause invalid, reasoning that since plaintiff did not have the capacity to produce the coal it purchased, the purpose of the clause must be secondary.

Defendants correctly note that the "right of control" test is but one factor to consider in determining whether the object of an agreement was to promote primary or secondary activity. *International Longshoremen's and Warehousemen's Union, Local 62–B v. NLRB*, 781 F.2d 919, 927 (D.C.Cir. 1986). The Supreme Court discussed the application of the "right of control" test by the National Labor Relations Board in *NLRB v. Pipefitters*, 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977). The Court, *Id.* at 521, n. 8, 97 S.Ct. at 899, n. 8, noted that the Board "has declared its intention to continue to eschew a mechanical application of its control test in order to ascertain whether the struck employer is truly an unoffending employer," citing *Local 438, United Pipe Fitters (George Koch Sons, Inc.)*, 201 N.L.R.B. 59, 64, 1973 WL 4895 (1973). The Court, *Id.*, 429 U.S. at 524, 97 S.Ct. at 901, went on to hold that the Board, in applying its control standard, did not fail to consider all of the relevant circumstances as required by the totality-of-the-circumstances test recognized in *National Woodwork*. The opinion in *Pipefitters* indicates that the right of control is only one factor to consider in analyzing an agreement, and that the factfinder is free to assign to this factor whatever weight is appropriate under the circumstances. *Id.*

The stipulations of the parties reveal that the purchase-of-coal clause was first included in Article XX of the National Bituminous Coal Wage Agreement of 1974. Order, Para. 21. That clause was also contained in Article XX of the 1988 Agreement at issue in this case. Order, Para 24. Defendants have submitted deposition testimony supporting their contention that there has always been a substantial difference in the amount of wages and benefits paid to employees of non-signatory as opposed to signatory employers. Defendants also argue that the purchase-of-coal clause was to protect union wages and benefits "by seeking to remove the economic incentive for signatories to purchase coal instead of producing it from their own resources using UMWA-represented employees." Defendants' Memorandum, p. 7.

According to the stipulations of fact, plaintiff does not contest that the motive, purpose or effect of the clause was to preserve work opportunities for employees of each signatory operator and the work standards, including wages and benefits, contained in the national agreements by eliminating the competitive advantages enjoyed by non-signatory operators due to lower labor standards and costs. Order, Paras. 25, 26. The stipulations further provide that plaintiff does not contend, and has no evidence, that the clause operated as a union organizing device, that the clause did not exert pressure on any non-UMWA operator to recognize the union, and that no non-signatory operator recognized the union to avoid the application of the clause. Order, Para. 27. Plaintiff does not argue that the union had any other secondary objective in mind.

The evidence and stipulations before the court support the conclusion that the purchase-of-coal clause was intended to promote union standards by ensuring the viability of the UMWA's pension and benefit funds. No evidence has been presented that the clause had any secondary effect on plaintiff's non-signatory suppliers, or that the UMWA in bargaining for the clause had any secondary objective in mind. The question is whether, considering the present record, a trier of fact could reasonably infer from plaintiff's lack of capacity to produce the coal it purchased that the purchase-of-coal clause was intended to achieve a secondary objective in this case.

This case does not involve a situation such as that in *Pipefitters*, where the signatory employer-subcontractor had no control over labor decisions made by the general contractor. The evidence would reasonably support

a conclusion that plaintiff did have control over the amount of coal it produced in its own mine and the number of employees it used to produce this coal. The evidence suggests that other economic factors, such as market price and demand for coal, had a bearing on plaintiff's economic capacity to produce, and may have influenced plaintiff's decisions concerning the amount of coal it produced and the amount of coal it purchased from non-union suppliers. However, a trier of fact could reasonably infer from this evidence that the UMWA, in bargaining for a purchase-of-coal clause, was concerned that plaintiff, in weighing its options, would tip the scales in favor of the economic benefit and greater profits to be derived from purchasing cheaper non-union coal to fulfill its contract obligations as opposed to employing union members to produce its own coal, thereby depriving union members of valuable pension benefits.

Plaintiff relies heavily on *Riverton Coal Co. v. UMWA,* 453 F.2d 1035 (6th Cir.1972). In that case, the Sixth Circuit held invalid a predecessor to the purchase-of-coal clause at issue in this case known as the "80-cent penalty clause." The "80-cent penalty clause" was so named it because required signatories to pay eighty cents per ton of coal purchased from non-signatory producers into the UMWA Welfare Fund, whereas signatories were only required to pay forty cents into the Fund for every ton of coal produced by them. Therefore, the clause on its face had the attributes of a penalty. In contrast, the version of Article XX, § (d)(1)(v) at issue in this case requires signatories to contribute the same amount to the various pension and benefit funds for coal purchased from non-signatories as they are required to contribute for coal they produce themselves. See Article XX, § (d)(1).

The circumstances present in *Riverton* are also distinguishable from those in this case. In *Riverton*, the district court found on the merits that an object of the union's strike to enforce the "80-cent penalty clause" was to compel Riverton to cease doing business with non-signatory coal producers. *Riverton,* 453 F.2d at 1040. The district court also found that prior to the signing of the 1964 labor agreement which contained the "80-cent penalty clause," the union called to Riverton's attention the fact that it was doing business with non-union suppliers and solicited Riverton's help in organizing these operators. *Id.* at 1038. The union later contacted Riverton to ascertain what it was doing to force non-signatory operators to unionize, but Riverton did nothing to induce these operators to become signatories. *Id.* The union organized a strike in 1964, and the district court found that an object of this strike was to force Riverton to sign the 1964 agreement containing the penalty clause and to cease dealing with non-union producers, and to encourage Riverton's non-union suppliers to become signatories. *Id.* The district court further found that Riverton signed the 1964 agreement containing the penalty clause, and that, as a result, fifteen out of thirty-seven non-union producers from which Riverton acquired coal became signatories. *Id.* at 1038–39.

Here, in contrast, it is uncontested that the motive, purpose or effect of the purchase-of-coal clause was to preserve work opportunities and work standards, that the clause did not exert pressure on non-union producers to become signatories, and that no non-union producer became a signatory in order to avoid the application of the clause. Order, Paras. 25, 27. There is no evidence that plaintiff, in negotiating the Agreement, raised the issue of lack of capacity or otherwise contested the appropriateness of the clause in this situation. Paragraph 9 of plaintiff's complaint reveals that a local Memorandum of Understanding was consummated between plaintiff and the local union regarding contributions on coal transloaded by the Ohio Valley Transloading Company, plaintiff's subsidiary. Thus, plaintiff was obviously aware that such matters could be the subject of local bargaining, yet there is no evidence that the purchase-of-coal clause as applied otherwise was ever negotiated or questioned. Unlike *Riverton,* where the union organized a strike to apply pressure on the operator to sign a labor agreement containing the penalty clause, there is no evidence here that plaintiff was pressured in any way to approve the purchase-of-coal clause.

Plaintiff notes language from *Riverton*, 453 F.2d at 1040, where the court states that the "80–cent penalty clause" was not directed at job security because Riverton could comply by closing its mines and filling all its requirements from other signatory operators. This language, as noted by the Third Circuit in *Bituminous Coal*, 756 F.2d at 292, n. 9, is dicta, and therefore is not binding. *United States ex rel. Saginaw Chippewa Tribe v. Michigan*, 882 F.Supp. 659, 666 (E.D.Mich.1995). Further, these comments must be viewed in the context of the facts in that case, which overall strongly supported a finding of secondary motive. It should also be noted that the Sixth Circuit never expressly disagreed with the finding of the district court that a primary purpose of the penalty clause was to protect the integrity of the UMWA Welfare and Retirement Fund. *See, Riverton*, 453 F.2d at 1040. If a signatory employer produces the coal or purchases it from another signatory operator, the employer is obligated to contribute to the union pension and benefit funds. However, a non-signatory operator is not obligated to make contributions to those funds. If a signatory employer decided to purchase all of the coal needed to satisfy its obligations from non-union operators to avoid the obligation to contribute to these funds, the viability of the funds would be threatened. The purchase-of-coal clause satisfies the primary purpose of maintaining the integrity of the pension and benefit funds by guaranteeing that contributions are made to those funds by the employer regardless of whether the employer chooses to produce the coal or to purchase it.

In referring to Riverton's capacity to produce coal, the Sixth Circuit, *Id.*, never stated that the employer's lack of capacity to produce would *per se* render a work standards clause invalid. Even if the decision is so construed, this approach would no longer be valid in light of the subsequent opinion of the Supreme Court in *Pipefitters*, which reaffirms the totality-of-the-circumstances approach in *National Woodwork* and makes it clear that the right to control is only one factor to be considered in determining whether the union's object was to promote primary or secondary activities.

The "right to control" doctrine was intended to help resolve "whether the union exerted pressure on the proper (primary) employer." *Local 32B–32J, Serv. Employees Int'l Union, AFL–CIO v. NLRB*, 68 F.3d 490, 495, n. 5 (D.C.Cir.1995). Considering the evidence and stipulations presented in this case, no trier of fact could reasonably infer from plaintiff's lack of capacity to produce all the coal it required that the local bargaining unit must have intended to achieve a secondary objective, such as organization of non-signatories, through the purchase-of-coal clause. Such an inference is contrary to all of the other evidence in the case, which indicates that the union's purpose was primary, not secondary.

No reasonable trier of fact could find from the evidence offered in these summary judgment proceedings that the purchase-of-coal clause contained in Article XX, § (d)(1)(v) of the 1988 Agreement signed by plaintiff was intended to or in fact achieved any secondary purpose. Rather, the only reasonable conclusion based on the record before the court is that the union intended to achieve the primary objectives of preservation of work opportunities and work standards in relation to the plaintiff. No genuine issue of material fact has been shown to exist in regard to the legality of the purchase-of-coal clause under § 8(e) of the NLRA, and defendants are entitled to summary judgment on this issue.

In accordance with the foregoing, defendants' motion for summary judgment is granted.

It is so ORDERED.