*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0114p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

SHAFER REDI-MIX, INC.,

               *Plaintiff-Appellant,*

    *v.*

CHAUFFEURS, TEAMSTERS & HELPERS LOCAL
UNION #7, identified on initiating document
as Local 7 Teamsters,

               *Defendant-Appellee.*

No. 09-2323

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 08-00652—Robert Holmes Bell, District Judge.

Argued: July 28, 2010

Decided and Filed:  May 5, 2011

Before:  GIBBONS and KETHLEDGE, Circuit Judges; SARGUS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Timothy J. Ryan, KOTZ, SANGSTER, WYSOCKI AND BERG, Grand Rapids, Michigan, for Appellant.  Gerry M. Miller, PREVIANT, GOLDBERG, UELMAN, GRATZ, MILLER & BRUEGGEMAN, Milwaukee, Wisconsin, for Appellee.  **ON BRIEF:** Timothy J. Ryan, KOTZ, SANGSTER, WYSOCKI AND BERG, Grand Rapids, Michigan, Nathan R. VanRyn, MCSHANE & BOWIE, P.L.C., Grand Rapids, Michigan, for Appellant.  Gerry M. Miller, Nathan D. Eisenberg, PREVIANT, GOLDBERG, UELMAN, GRATZ, MILLER & BRUEGGEMAN, Milwaukee, Wisconsin, for Appellee.

      GIBBONS, J., delivered the opinion of the court, in which SARGUS, D. J., joined.  KETHLEDGE, J. (p. 13), delivered a separate dissenting opinion.

_____

[*]The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

1

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.  Plaintiff-appellant Shafer Redi-Mix, Inc. ("Shafer") appeals the district court's grant of summary judgment to defendant-appellee Chauffeurs, Teamsters & Helpers, Local Union # 7 ("Local 7" or "the union"). Shafer alleges that Local 7 caused it to lose a construction contract by having one of its sister unions threaten to boycott the project unless Shafer, a non-union employer, was replaced by a unionized supplier.  The district court held that Shafer was unable to show that the boycott threat was the proximate cause of its removal because the subcontractor that hired Shafer acted on a competing concrete-supply bid to satisfy the general contractor's long-standing desire to use a unionized supplier.  For the following reasons, we affirm the district court's decision.

I.

Clark Construction, Inc. ("Clark") was the general contractor for the construction of the Firekeepers Casino Project in Battle Creek, Michigan.  Clark subcontracted a portion of the casino project to Grand River Construction, Inc. ("Grand River").  In February 2008, Grand River solicited and received bids for "redi-mix" concrete from two subcontractors, Shafer and Consumers Concrete ("Consumers").  According to Grand River's project manager, Bradley Foster, Shafer was selected as the concrete supplier because its bid was lower than that of Consumers.

About a week after Grand River submitted its bid to Clark in early February 2008, there was an initial proposal meeting between Clark and Grand River in which Foster and William Kersaan, owner of Grand River, participated.  During this meeting, Duane Wixson, Clark's project manager, told Kersaan and Foster that "[t]here would be union trade problems" with the project.  Foster testified at his deposition that, at the time Grand River chose Shafer, Shafer knew "[t]hat it was questionable whether [Grand River] could use them on the job."  Wixson testified that he was concerned that the

project would have to be dual-gated, meaning that Clark would have to maintain one gate for union employees and another for non-union workers.

The project was covered by a Project Labor Agreement ("PLA") that contained a no-picketing provision, which read, in relevant part:

> During the existence of this Agreement, the Unions shall not permit nor shall they participate in any strike, picketing, hand-billing, public notices, slowdown, withholding of work, refusal to work . . . or other work stoppage of any type or any interference with the work of the contractor(s), owner, or others related in any manner to the Project to occur, for any reason by the Union or the Employees against any Contractor covered under this agreement on this Project and there shall be no lock-out by the Contractor.

Local 7 signed the PLA at a pre-job conference in early May 2008 as did Shafer Group, LLC, the entity used by Shafer to pay wages and benefits to employees. During the conference, an unidentified representative of Local 7 expressed reservations about Grand River's choice of Shafer, a non-union contractor and said that he would rather have Consumers supply concrete for the project. When Foster offered Clark the option of using Consumers, Wixson did not instruct Foster to make a change. On May 20, 2008, Shafer submitted its designs for the concrete mix to be used on the project to Grand River in preparation for the concrete pour. However, Clark still had reservations about Shafer's participation and did not approve the mix design.

On May 21, 2008, Wixson received a telephone call from three union representatives, including Tom Harty of Local 7 and Al Sprague of a sister union, Local 164 of Jackson, Michigan. During the call, Harty asked Wixson why Consumers had not been awarded the contract, and Wixson replied that Consumers's bid was higher than that of Shafer. The union representatives repeated Local 7's concerns about the use of a non-union contractor and, according to Wixson, one of the representatives indicated that if Shafer remained on the project, there could be a labor disruption because Local 164 could picket the project. At his deposition, Wixson recalled that he reminded the union representatives of the no-picketing clause of the PLA and explained that although

Local 164 was not bound by the PLA, he "was making no distinction between the Jackson local and any other local." Harty said that Local 7 would abide by the PLA, but Sprague did not make that promise. Wixson testified that he spoke only with Clark's project superintendent, Ken Stevenson, about the call and did not recall discussing it with anyone else, including Grand River.

After his call with Wixson, but on the same day, Harty called Foster to confirm that Consumers's higher bid was the factor that prevented it from winning the contract. Harty offered to speak with Tom Thomas, the CEO of Consumers, about the price discrepancy. Thomas testified that, upon receiving Harty's call, he understood for the first time that there was a price discrepancy between the Consumers bid and Shafer's. He called Foster and told him that he would investigate the discrepancy. Thomas called Foster again later that day and explained that Consumers had submitted two sets of bids—one that reflected the price of concrete mixed to the full specifications of the architects and another, lower price, that reflected Consumers's assessment of what the project would actually require. Foster agreed that, in light of Thomas's explanation, there was no price discrepancy between the two bids. Because Consumers had a long-standing relationship with Grand River as a "preferred supplier," Thomas offered to match Shafer's price. Foster instructed Thomas to resubmit a revised bid and to provide specifications for the concrete so that Foster could send them to Clark "as soon as possible." Foster testified that by telling Thomas to resubmit his bid and create the concrete specifications, he was effectively awarding Consumers the contract and told Consumers to prepare for the concrete pour during the following week.

The next day, Consumers submitted a revised bid and concrete mix specification. The final decision to remove Shafer from the project was made by Foster, Kersaan, and another Grand River officer after they received the revised bid. Kersaan testified that he was not aware of the call between Wixson and the union representatives at the time Grand River decided to switch suppliers. However, he knew from prior conversations with Clark that the general contractor wanted Grand River to make a change to promote labor harmony. Although Foster recommended staying with Shafer, Kersaan decided

that "if Clark wanted it switched we would go to Consumers." Foster testified that Grand River wanted a letter from Clark stating that it wanted Shafer off the project, which Clark eventually provided on May 29, 2008. The letter stated that it was Clark's "desire to promote labor harmony" on the project that led it to "prefer[] that the concrete supplier be unionized."

Shafer then filed suit in federal district court, alleging that Local 7 violated 29 U.S.C. § 158(b)(4) by engaging in an illegal secondary boycott whereby the union threatened to picket Clark, a neutral employer, unless Grand River removed Shafer from the project. Shafer sought $650,000 in damages. Local 7 filed a motion for summary judgment, which the district court granted. Before the district court, Local 7 made three arguments: (1) Shafer could not demonstrate that Local 7 made an illegal secondary boycott threat; (2) Local 7 was not responsible for any illegal secondary boycott threat because it was made by Local 164, over which Local 7 had no control; and (3) Consumers's revised offer to match Shafer's price, and not any threat by Local 7 or Local 164, was the proximate cause of Grand River's decision to switch suppliers. In response to Local 7's motion, Shafer argued that, to survive summary judgment, it was required to establish only some causal connection between the threat to picket and Grand River's decision to choose Consumers. Shafer relied primarily on the temporal proximity between the May 21 phone call and Clark's May 29 letter stating its preference for a unionized contractor.

The district court found that there existed genuine issues of material fact as to whether there was an illegal threat to picket and whether Local 7 was responsible for statements made by Local 164's representative. Specifically, the district court pointed to Wixson's declaration that during the call on May 21, 2008, union representatives threatened to "picket" the project. The court found that this statement contained a "specific suggestion that there might be picketing" and, thus, raised a genuine issue of fact as to the existence of a genuine secondary threat. The court then assumed, without deciding, that the May 21 call between Wixson and three union representatives could

raise the inference that Local 164 made a threat to picket that Local 7 could not itself credibly make because it was bound by the no-picketing clause of the PLA.

On the issue of causation, however, the district court held that the record did not support the conclusion that the illegal threat to picket was the proximate cause of Grand River's decision to terminate Shafer. The court found that, contrary to Shafer's insistence that Wixson began to pressure Grand River to change suppliers after the May 21 call, Grand River was aware of problems relating to Shafer within a week of submitting its bid for the project to Clark. The court explained that Grand River's decision was motivated by Clark's long-standing objections to Shafer and not by Local 7's actions. The court noted that there was no evidence that Wixson, Clark's project manager, had any contact with Grand River between his call with the union representatives on May 21 and Grand River's solicitation of a new bid from Consumers later that day. Because principals at Grand River had already decided to replace Shafer to satisfy Clark, the court found that any threat made by Local 7 (or Local 164 on its sister union's behalf) was not the proximate cause of Shafer's removal. The district court granted summary judgment to Local 7 and Shafer timely appealed.

## II.

We review a district court's decision to grant a motion for summary judgment *de novo*. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(c). We must view the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party must provide evidence sufficient to establish all of the essential elements of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Such evidence must be based on "more than mere speculation, conjecture, or fantasy." *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (citation and internal quotation marks omitted).

In relevant part, 29 U.S.C. § 158(b)(4)(ii)(B) provides, "It shall be an unfair labor practice for a labor organization or its agents . . . to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . . forcing or requiring any person . . . to cease doing business with any other person[.]" During such a "secondary boycott," a "union brings economic pressure to bear on a 'primary employer' to do something the union wants . . . by inducing a 'secondary employer' doing business with the primary employer to bring economic pressure on the primary employer." *F.A. Wilhelm Constr. Co. v. Ky. State Dist. Council of Carpenters*, 293 F.3d 935, 938 (6th Cir. 2002). "The statute does not mention primary object or purpose. If any object of the strike is forbidden by [§ 158(b)(4)], it is a secondary boycott. It is not necessary to find that it was the sole object." *Riverton Coal Co. v. United Mine Workers*, 453 F.2d 1035, 1040 (6th Cir. 1972). In this vein, a threat of labor trouble is sufficient to violate § 158(b)(4). *See NLRB v. Servette, Inc.*, 377 U.S. 46, 52–54 (1964); *Allied Mech. Servs. v. Local 337 of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indust.*, 221 F.3d 1333, 2000 WL 924594, at *12 (6th Cir. June 26, 2000) (unpublished table decision).

The statute does not prohibit a union from picketing a primary employer. As the Supreme Court has explained, the secondary boycott provisions serve two purposes: "the preservation of the right of labor organizations to place pressure on employers with whom there is a primary dispute as well as the protection of neutral employers and employees from the labor disputes of others." *Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. 212, 223 n.20 (1982). The decisions of the National Labor Relations Board are not controlling in damages actions seeking to enforce § 158(b)(4). *Riverton Coal Co.*, 453 F.2d at 1042.

A separate statutory provision, Section 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187, creates a private cause of action for damages suffered "by reason [of]" a violation of § 158(b)(4). As the Ninth Circuit has explained, the standard of causation for a violation of § 187 dictated by the phrase "by reason [of]" is

that the defendant's conduct must have "materially contributed" to plaintiff's injury or was a "substantial factor" in bringing it about, "notwithstanding other factors contributed also." *Mead v. Retail Clerks Int'l Assoc., Local Union No. 839*, 523 F.2d 1371, 1376 (9th Cir. 1975) (citations omitted). In defining this standard, the *Mead* court observed that Section 303 "was enacted as an alternative to subjecting unions to antitrust liability for secondary activities," with its language "drawn directly from the treble damage provision of the Clayton Act." *Id.* (citing *Connell Constr. Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 634 & n.15 (1975)). *Mead* thus concluded that, because "by reason of" is read in the antitrust context "as incorporating common law principles of causation, with such modifications as may be suggested by the statute as a whole, and by Congress' object and purpose," the "same reading is appropriate" in § 187 actions. *Id.* (internal citations omitted); *see also Commerce Tankers Corp. v. Nat'l Maritime Union*, 553 F.2d 793, 800–01 (2d Cir. 1977) (noting that an injury sustained by reason of an antitrust violation requires "the trier of fact to establish that the violation was a 'material cause' of or a 'substantial factor' in the occurrence of damage"); *cf. Carruthers Ready-Mix, Inc. v. Cement Masons Local Union No. 520*, 779 F.2d 320, 322–24 (6th Cir. 1985) (holding that the common law tort of interference with a contract is analogous to a § 187 action).

Several of our sister circuits have adopted the *Mead* standard of proximate causation for recovering damages under § 187, likewise requiring that the defendant's conduct "materially contributed" to the plaintiff's injury or was a "substantial factor" in bringing it about. In *Feathers v. United Mine Workers*, the Third Circuit applied *Mead* in deciding whether an employer was entitled to damages following a union strike aimed at achieving an agreement that included—among other lawful objectives—an unlawful hot cargo clause. 711 F.2d 530, 537–38 (3d Cir. 1983). The court resolved that "[t]o receive a damage award under [303(b)], the plaintiffs . . . must demonstrate not that the unlawful hot cargo [clause] was *an* object of the . . . strike, but that it was a *substantial factor* in or *materially contributed* to the Union's decision to call and maintain that strike. The mere fact that the agreement the Union sought to obtain by striking

contained a hot cargo clause is not enough, without more, to support a finding that the clause was a substantial factor."  *Id.* at 538; *see also Feather v. United Mine Workers*, 903 F.2d 961, 965–66 (3d Cir. 1990); *Intercity Maint. Co. v. Local 254, Serv. Emp. Int'l Union*, 241 F.3d 82 n.3 (1st Cir. 2001) (noting that the First Circuit has adopted the *Mead* standard in cases where "both lawful and unlawful union activity" are at issue); *John B. Cruz Constr. Co. v. United Bhd. of Carpenters, Local 33*, 907 F.2d 1228, 1232 (1st Cir. 1990) (adopting the *Mead* standard and requiring a plaintiff to establish "with reasonable probability the existence of some causal connection between the defendant's wrongful act" and the injury) (internal quotations omitted).  The Eighth Circuit, while not expressly adopting *Mead*, has similarly applied a proximate cause standard for evaluating damages under § 187.  *See Pickens-Bond Constr. Co. v. United Bhd. of Carpenters & Joiners, Local 690*, 586 F.2d 1234, 1242 (8th Cir. 1978) (stating that damages under Section 303 "must be both non-speculative and proximately caused by Union wrongdoing").

Consistent with the Ninth Circuit's approach, this circuit has likewise read the phrase "by reason [of]" under § 187 to mean that the plaintiff must prove that his injuries were proximately caused by the defendant's unlawful conduct.  Indeed, we have remarked that "[o]nce liability is established, [the injured party] is entitled to recover all damages 'directly and proximately' caused" by the defendant's violation. *F.A. Wilhelm*, 293 F.3d at 941 (quoting *Riverton Coal Co.*, 453 F.2d at 1042); *see also Flame Coal Co. v. United Mine Workers*, 303 F.2d 39, 44 (6th Cir. 1962) (permitting recovery in a secondary boycott case where a jury could find that the plaintiff's "damages were proximately caused by defendant's tortious misconduct").  A plaintiff may prove its case with circumstantial evidence.  *See Sunfire Coal Co. v. United Mine Workers*, 313 F.2d 108, 109–10 (6th Cir. 1963).

Shafer asserts that the district court ignored three disputed material facts in the record that are enough to defeat Local 7's motion for summary judgment.  First, Shafer contends that Foster's testimony establishes that the second bid submitted by Consumers was insufficient by itself to cause Grand River to remove Shafer from the project

because Foster wanted a letter from Clark stating that the latter instructed Grand River to remove Shafer.  Second, Shafer contests the district court's determination that it was undisputed that Clark was hostile to Shafer before the May 21, 2008, phone conversation between Wixson and the union representatives.  Finally, Shafer argues that so long as the illegal secondary threat was *a* factor in Clark's decisionmaking, a jury should determine whether the threat was a substantial factor in Shafer's losses.

The record does not support Shafer's characterization of it.  The evidence is undisputed and reveals the following factual scenario.  With respect to Clark's May 29, 2008, letter, the evidence does not indicate that the letter was a  condition precedent to a change in suppliers.  Instead, the letter served to confirm a decision already made by Grand River.  Kersaan, as the head of Grand River, wished to accommodate Clark's long-standing reservations about using a non-union supplier.  After learning of the price discrepancy between Consumers's bid and Shafer's on May 21, Thomas called Foster, who granted Consumers the opportunity that day to investigate the discrepancy and discuss its bid further.  Once Consumers explained that it had submitted two bids and was willing to match Shafer's price, Foster told Thomas to "get prepared for the project and requote" meaning that Consumers was "more than likely [to] end up with the project."  The decision to remove Shafer was made by Kersaan and Foster without any knowledge of Wixson's conversation with the union representatives. Grand River switched from Shafer to Consumers on the basis of the revised bid and concrete mix specification.  According to Wixson, Clark then sent the May 29 letter to Shafer only "at the request of Brad Foster," who was instructed to obtain the letter by Kersaan.  Thus, the record shows that Grand River had been aware of Clark's previously expressed concerns about Shafer and, independent of the threat to picket, took advantage of Consumers's "eleventh hour" rebid as an opportunity to satisfy Clark.

Furthermore, the record shows that, from the beginning of the project, Clark was concerned about working with Shafer because the use of non-union and union employees on the same project would have required a dual-gate arrangement that could have led to labor discord.  Indeed, Grand River was aware of this in early February 2008 when it

initially met with Clark to discuss the project. Local 7 confirmed Clark's fears at the pre-job conference when a union representative objected to Shafer's involvement. Kersaan stated that he had several conversations with Clark in which these issues came up and he knew that Clark wanted to change suppliers before the decision to switch was made.

Clearly, the evidence supports the inference that Clark's concern about use of a non-union supplier influenced Grand River's decision to switch to Consumers as supplier. Yet, there is no evidence supporting a finding that the threat to picket was a factor in Grand River's decision. There is no evidence that Wixson told Foster or any other Grand River representative about his conversation with Harty and Sprague, Local 164's representative. Wixson testified that he briefed Stevenson, a Clark employee, about the conversation but could not recall speaking with anyone else about it. Although Wixson said he "may" have spoken with Foster about it, he was unable to say when such a conversation may have taken place. Kersaan's testimony confirms that Grand River was unaware of Wixson's conversation with Harty and Sprague when it decided to remove Shafer from the project. Thus, Shafer is left with the argument that the temporal proximity between the illegal secondary boycott threat and its removal from the project is a sufficient basis for a jury to infer that the former caused the latter. Shafer cites no cases indicating that mere temporal proximity is sufficient to satisfy § 187's "by reason [of]" causation element. And the record provides no help to Shafer in supplying other circumstances which might combine with temporal proximity to permit such an inference. At best, Shafer has shown that the timing of Wixson's May 21conversation with the union representatives and Grand River's decision was coincidental.

Because Clark had long-standing reservations about Shafer, of which Grand River was aware and wished to accommodate, and there is no evidence that Grand River knew about the conversation between Wixson and the union representatives, Shafer's argument for causation rests on mere speculation. Such a conjecture does not show that Local 164's threat was a factor in Grand River's decision, much less a "substantial factor." *See Mead*, 523 F.2d at 1376–77. There is no question that Local 7 strongly

opposed Shafer's involvement in the project and sought to have a unionized employer substituted, but Shafer has failed to present evidence of a causal link between the threat and Grand River's decision that rises above "mere speculation, conjecture, or fantasy." *Lewis*, 355 F.3d at 533. Thus, we affirm the district court's grant of summary judgment because Shafer has failed to satisfy the causation element of a § 187 action.[1]

## III.

For the foregoing reasons, we affirm the district court's decision.

---

[1]Because we resolve this case on the issue of causation, we need not address the district court's rulings that genuine issues of material fact exist as to whether an illegal secondary boycott threat was made during the May 21, 2008, phone call and whether such a threat by Local 164 may be imputed to Local 7 under either an agency or "joint venture" theory of liability.

—————————

**DISSENT**

—————————

KETHLEDGE, Circuit Judge, dissenting.  I believe the evidence in this case would allow a jury to conclude that the unions' threat and the project manager's prompt action in conformance with the threat were not mere coincidences.  Taken in the light most favorable to Shafer, the evidence shows that Clark's project manager, Wixson, originally declined Grand River's offer to remove Shafer; that Wixson told Shafer it was "all set" after signing the Project Labor Agreement; that weeks later the unions threatened to picket if Shafer remained on the project; and that Wixson responded to that threat by pressuring Grand River to replace Shafer.  A reasonable jury could conclude from this evidence that the unions' threat had been a "substantial factor" in Wixson's decision to swap out a non-union supplier (Shafer) for a union one.  I would reverse and remand for trial, and thus I respectfully dissent.