756 F.2d 284
 119 L.R.R.M. (BNA) 3148, 102 Lab.Cas. P 11,391
 In re BITUMINOUS COAL WAGE AGREEMENTS.
Appeal of TRUSTEES OF the UNITED MINE WORKERS OF AMERICA
HEALTH AND RETIREMENT FUNDS, in Nos. 84-3166 & 84-3220.
Appeal of INTERNATIONAL UNION, UNITED MINE WORKERS OF
AMERICA, in Nos. 84-3167 & 84-3237.
Appeal of DUQUESNE LIGHT COMPANY and Associated Electric
Cooperative, Inc., in Nos. 84-3371 & 84-8067.
 Nos. 84-3166, 84-3167, 84-3220, 84-3237, 84-3371 and 84-8067.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 26, 1984.
Decided Feb. 27, 1985.
Rehearing and Rehearing In Banc in Nos. 84-3166, 84-3167,
84-3220, 84-3237 and 84-3371 Denied April 1, 1985.
 
 Stephen J. Pollak (argued), Ralph J. Moore, Jr., Wendy S. White, Julie Melamud, Shea & Gardner, William F. Hanraham, Washington, D.C., for Trustees of United Mine Workers of America Health and Retirement Funds.
 Earl V. Brown, Jr. (argued), Michael H. Holland, Willard P. Owens, Kurt Kobelt, United Mine Workers of America, Washington, D.C., for Intern. Union, United Mine Workers of America.
 David McNeil Olds (argued), Daniel I. Booker (argued), Michael E. Lowenstein, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for Duquesne Light Co., Associated Elec. Co-op., Inc., Union Carbide Corp. and U.S. Fuel Co.; Walter T. Wardzinski, Larry R. Crayne, Pittsburgh, Pa., of counsel, for Duquesne Light Co.
 Eugene E. Andereck, Stockard, Andereck, Hauck, Sharp & Evans, Jefferson City, Mo., for Associated Elec. Co-op., Inc.
 Robert L. Doan, Richard P. Lawlor, Danbury, Conn., for Union Carbide Corp.
 Anthony J. Polito, David J. Laurent, Corcoran, Hardesty, Ewart, Whyte & Polito, P.C., Pittsburgh, Pa., for Consolidation Coal Co., Gilbert Fuel Co., Harmar Coal Co., La Luz Ohio, Inc., Muskingum Mining Co., Royalty Smokeless Coal Co., Shannon Pocahontas Coal Co. and Virginia Crews Coal Co.
 E.M. Payne, III, File, Payne, Scherer & Brown, Beckley, W.V., for Douglas Pocahontas Coal Co.
 John W. Latella, Cauley, Conflenti & Latella, Pittsburgh, Pa., for Luzerne Coal Corp.
 Milton T. Herndon, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, W.V., for Metco Mining Corp.
 Gregg M. Rosen, Rosen & Mahfood, Pittsburgh, Pa., for Old Home Manor, Inc.
 Harry L. Hopkins, Charles C. Pinckney, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for Pulltight Coal, Inc., Lakeside Coal Co. and Kinlock Coal, Inc.
 John L. Kilcullen, Kilcullen, Wilson & Kilcullen, Chartered, Washington, D.C., for Reitz Coal Co. and Doe Valley Coal Co.
 Jeffrey J. Leech, Tucker & Arensberg, P.C., Pittsburgh, Pa., for West Newton Coal Logistics Co.
 Laurence Gold, Elliott Bredhoff, Michael H. Gottesman, David M. Silberman, Bredhoff & Kaiser, Washington, D.C., for American Federation of Labor and Congress of Indus. Organizations and Indus. Union Dept., AFL-CIO, as amici curiae; George Kaufmann, Washington, D.C., of counsel.
 Robert A. Dufek, Charles P. O'Connor, Morgan, Lewis & Bockius, Washington, D.C., for Bituminous Coal Operators' Ass'n, Inc., as amicus curiae.
 Before HUNTER and WEIS, Circuit Judges, and THOMPSON, District Judge.*
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 The United Mine Workers Union has incorporated a "purchased-coal" clause in its collective bargaining agreements. By its terms, a signatory employer must contribute to the Union Health and Retirement Funds an equal amount per ton of coal whether it mines the mineral or purchases it from a non-signatory. The district court enjoined enforcement of the clause because it was union signatory on its face. However, we conclude that the legality of the provision must be resolved in the circumstances affecting each purchase. Accordingly, we will vacate the summary judgment in favor of the employers and remand. Because resolution of these issues may moot the employers' antitrust claims, we will remand them as well.
 
 
 2
 This litigation consists of twenty-four cases that the Judicial Panel on Multidistrict Litigation consolidated and transferred to the district court for pre-trial proceedings. Common to all is the legality of a clause in three successive multi-employer collective bargaining agreements between the United Mine Workers and the Bituminous Coal Operators Association. In most of the suits the Trustees of the UMW Health and Retirement Funds seek to recover allegedly delinquent contributions from signatory employers, who in turn defend on the basis that the clause violates Sec. 8(e) of the National Labor Relations Act. 29 U.S.C. Sec. 158(e) (1982). Several employers brought other complaints seeking either declaratory relief or damages under the labor and antitrust laws.
 
 
 3
 The district court held that on its face the purchased-coal clause violated Sec. 8(e) and entered summary judgment against the trustees. Having enjoined enforcement of the clause, the court did not consider claims for injunctive relief under the Sherman Act. However, in two cases employers sought antitrust damages. In those suits the court concluded that the rule of reason applied, and that unresolved questions of fact precluded summary judgment.[1] Because the orders in these latter two cases were not final, the court certified for appeal under 28 U.S.C. Sec. 1292(b) the question whether the per se rule applied to the antitrust claims.
 
 
 4
 In their collective bargaining agreements of 1974, 1978, and 1981, the United Mine Workers and the Bituminous Coal Operators Association included Article XX(d)(1)(v), which is now familiar as the purchased-coal clause. It reads in pertinent part:
 
 
 5
 "... each signatory employer shall ... contribute to the Trusts ... in the amounts shown below based on cents per ton ... of bituminous coal after production by another operator, procured or acquired by such Employer for use or sale on which contributions to the appropriate Trusts as provided for in this Article have not been made...."
 
 
 6
 When read in conjunction with the "produced-coal clause,"[2] the effect is to require an employer-signatory to pay an identical contribution to the Health and Retirement Funds whether the coal was extracted from the employer's mines or was bought from an operator that had not already paid the contribution on the assessed tonnage.
 
 
 7
 After the suits were consolidated but before discovery commenced, a number of the employers filed motions for summary judgment, contending that the clause on its face violated Sec. 8(e) of the NLRA. The district court stayed discovery pending disposition of the motions. In opposition to the motions, the union and trustees submitted evidence to show that as a result of the negotiated wage rates for union members, the signatory-employers had higher labor costs than did non-signatory employers. Consequently, unless the wage differential was offset, signatory operators would have an incentive to meet at least part of their customers' needs by purchasing coal at favorable prices from non-signatories.
 
 
 8
 The union saw this practice as a threat to the jobs of its members and, to discourage subcontracting, the purchased-coal clause was devised to narrow the gap between the labor costs of signatories and non-signatories--generally, nonunion operators.[3] As such, the trustees and the union contend that the provision is a union standards or work preservation clause.
 
 
 9
 The employers, however, characterize the clause as "union signatory," reasoning that it imposed a "penalty" or "tax" on coal purchased from non-signatories. From that standpoint, the employers assert that the clause was intended to encourage or compel other operators to enter into collective bargaining agreements with the UMW.
 
 
 10
 The employers point out that their signatory group includes not only commercial operators who sell the tonnage they produce but "captive" mines such as utilities which consume all of their own output. In addition, some of the signatories are "preparers" who do not mine but simply process supplies bought from others.
 
 
 11
 The district court found that the clause was not within the "union standards" definition because the contribution was imposed indiscriminately on a non-signatory "without taking into account that the non-union operator may have the same or better working conditions." 580 F.Supp. at 681. The "work preservation" label was rejected because the clause was intended to preserve the "work of the entire multi-employer bargaining unit." "The impact of the purchased-coal clause reaches beyond any case-defined 'work unit,' i.e., single employer, and seeks to benefit all Union members." Accordingly, the court concluded that the clause was not "addressed to the labor relations of the contracting employer vis-a-vis his own employees" and hence was an illegal "union signatory" provision. 580 F.Supp. at 680.
 
 
 12
 In the antitrust damage suits, the court concluded that the purchased-coal clause was not "a classic group boycott [and] therefore [not] a per se violation." It was not "an effort to exclude or cause disadvantage to one or more competitors by cutting them off from trade relationships which are necessary to any firm trying to compete." 580 F.Supp. at 686. Finding insufficient facts in the record to conduct a rule of reason analysis, the court refused to grant summary judgment in favor of the employers on their antitrust claims. All parties have appealed.
 
 
 13
 The purchased-coal clause has a lengthy history. A predecessor, the protective wage clause, prohibited signatories from purchasing from operators whose employees mined coal under conditions less favorable than those in the 1958 agreement. After the National Labor Relations Board held the clause invalid, Raymond O. Lewis, 144 NLRB 228 (1963), the Court of Appeals for the District of Columbia vacated and remanded, Lewis v. NLRB, 350 F.2d 801 (D.C.Cir.1965). About four years later, the Board upheld the clause. W.A. Boyle, 179 NLRB 479 (1969), appeal dismissed, 468 F.2d 1139 (D.C.Cir.1972). The protective wage clause also figured prominently in a number of antitrust suits. See Ramsey v. United Mine Workers, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971); South East Coal Co. v. Consolidated Coal Company, 434 F.2d 767 (6th Cir.), cert. denied, 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149 (1971); Tennessee Consolidated Coal Co. v. United Mine Workers, 416 F.2d 1192 (6th Cir.), cert. denied, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970).
 
 
 14
 In the meantime, the parties had substituted the "80-cent clause." It required a signatory to pay 80 cents per ton on coal purchased from a non-signatory, but only 40 cents if the source was a signatory. The Board held this clause violated Sec. 8(e) only to be reversed once again by the Court of Appeals. UMWA v. NLRB, 399 F.2d 977 (D.C.Cir.1968). On remand, the Board found the clause to be valid. UMWA (Dixie Mining), 188 NLRB 753 (1971).
 
 
 15
 In an unrelated suit brought by an operator, the Court of Appeals for the Sixth Circuit found the 80-cent clause invalid. Riverton Coal Co. v. UMWA, 453 F.2d 1035 (6th Cir.), cert. denied, 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690 (1972). Following that decision, the present purchased-coal clause was substituted.
 
 
 16
 The current clause has not been reviewed in any appellate proceeding, but did appear in the background in Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982). There, the Court held that an employer may raise the legality of the provision as a defense to a trustees' suit for past due contributions. The clause's validity was not an issue before the Court and was not decided.
 
 
 17
 The purchased-coal provision must be tested against the pertinent prohibitions of Sec. 8(e):
 
 
 18
 "It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement ... whereby such employer ceases or refrains or agrees to cease or refrain from ... dealing in any of the products of any employer, or to cease doing business with any other person...."
 
 
 19
 29 U.S.C. Sec. 158(e) (1982). The Supreme Court has held that the statute reaches only "secondary" pressures, National Woodwork Manufacturers Ass'n. v. NLRB, 386 U.S. 612, 638, 87 S.Ct. 1250, 1265, 18 L.Ed.2d 357 (1967). Thus, "primary" activity, such as work preservation, is not prohibited, even though secondary effects may be present.
 
 
 20
 If the purpose is to benefit the employees of the bargaining unit, the agreement is "primary" and does not run afoul of Sec. 8(e). If, however, the aim is to put pressure on an outside employer to submit to union objectives, the provision is secondary and prohibited. A. Duie Pyle, Inc. v. NLRB, 383 F.2d 772 (3d Cir.1967), cert. denied, 390 U.S. 905, 88 S.Ct. 819, 19 L.Ed.2d 871 (1968). The issue is
 
 
 21
 "whether the boycott was 'addressed to the labor relations of the contracting employer vis-a-vis his own employees,' National Woodwork, supra at 645 [87 S.Ct. at 1268], and is therefore primary conduct, or whether the boycott was 'tactically calculated to satisfy union objectives elsewhere', 386 U.S. at 644 [87 S.Ct. at 1268], in which event the boycott would be prohibited secondary activity."
 
 
 22
 NLRB v. Enterprise Association of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Machine & General Pipefitters of New York and Vicinity, Local 638 (Pipefitters), 429 U.S. 507, 511, 97 S.Ct. 891, 894, 51 L.Ed.2d 1 (1977). As the Court remarked, "This will not always be a simple test to apply." National Woodwork, 386 U.S. at 645, 87 S.Ct. at 1268.
 
 
 23
 Two well recognized primary provisions have emerged--work preservation and union standards clauses. If the union's objective is to retain work that is traditionally performed by employees represented by the union and also within the contracting employers' power to assign, Sec. 8(e) is not a bar. NLRB v. International Longshoremen's Ass'n., AFL-CIO, 447 U.S. 490, 504, 100 S.Ct. 2305, 2313, 65 L.Ed.2d 289 (1980). So long as the union has no forbidden secondary purpose to affect the employment relations of an outside employer, the agreement is valid even though it adversely affects the employment opportunities of non-represented workers. Id. at 507 n. 22, 100 S.Ct. at 2315 n. 22.
 
 
 24
 A union standards clause is designed to inhibit subcontracting of work that would otherwise be performed by members of the bargaining unit. This court described such an agreement in A. Duie Pyle as "the exaction of requirements designed to protect union standards against substandard competition which might be an incentive for an employer to deprive his unionized employees of work." A provision of that nature serves "a primary rather than a secondary objective, especially in light of the now prevalent view that union standards clauses are valid primary regulations." 383 F.2d at 777. Clauses "merely requiring that subcontractors observe the equivalent of union wages, hours and the like" fall within the definition of "union standards" and are "thus outside Sec. 8(e)'s prohibitions." Truck Drivers Union Local No. 413 v. NLRB, 334 F.2d 539, 548 (D.C.Cir.), cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964).
 
 
 25
 Falling on the other side of the line and violative of Sec. 8(e) are "union signatory clauses." In A. Duie Pyle, we held that a collective bargaining agreement may not prohibit an employer from contracting with enterprises or individuals that are not unionized.
 
 
 26
 "As in the case of secondary boycotts generally, a union may not employ a collective bargaining agreement with one employer as a means of effectuating its object to coerce another employer to unionize. Nor may it by this means seek to coerce self-employed persons to become union members."
 
 
 27
 383 F.2d at 777.
 
 
 28
 In a later case, Amax Coal Co. v. NLRB, 614 F.2d 872, 887 (3d Cir.1980), reversed on other grounds, 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981), we found invalid a clause restricting Amax's ability to license-out coal operations.
 
 
 29
 "... the clause forces the licensee-employer to abide by the union recognition portion of the contract. It serves only the union's organizing interests and does not protect the Amax employees' work standards.... Amax would be obliged to discontinue the licensing agreement if the licensee ever stopped recognizing the Union...."
 
 
 30
 See also, Truck Drivers Union Local No. 413, 334 F.2d at 548. (distinction between union standards and union signatory clauses is vital).
 
 
 31
 Thus, if the collective bargaining agreement requires the employer to subcontract only with firms that observe union standards, Sec. 8(e) has not been violated. Such a clause permissibly protects the employer's own workers since the non-union firm will not be able to offer lower prices based on sub-union wage and benefit standards. However, if an employer is prohibited from subcontracting except with unionized firms, the clause cannot be enforced, even though the employer's own workers receive the same protection afforded by a union standards provision.
 
 
 32
 The distinction between the two is based on the premise that the union signatory clause is designed to affect the labor relations of the non-union subcontractor and its employees. Thus, the interference is secondary. An argument may be made that a union standards clause has such effects to some lesser degree, but the distinction is firmly established.
 
 
 33
 With this brief exposition of the complexity surrounding the primary and secondary dichotomy under Sec. 8(e), we turn to the clause at issue in this case. The initial question which a court must decide is whether a violation of Sec. 8(e) appears on the face of the collective bargaining agreement. To find that the clause is prohibited, the court must determine the provision is "secondary in [its] purpose as well as [its] result." A. Duie Pyle, Inc. v. N.L.R.B., 383 F.2d at 777. That may be apparent, for example, when the clause's "necessary effect is to make the continuance of the relationship between the [signatory] employer and an independent contractor depend upon the latter's decision to become a member of the union." Id. at 777. In these limited circumstances a clause may be held invalid per se.
 
 
 34
 But it is often difficult, if not impossible, to determine from the wording of the clause the union's "tactical object," Woodwork Manufacturer's Association, 386 U.S. at 645, 87 S.Ct. at 1268, or "design," Amax Coal, 614 F.2d at 886. More than the document itself is generally needed for that analysis.[4] In A. Duie Pyle we noted that it is "undesirable to determine the conscious objective of a union in obtaining the inclusion of a challenged provision ... on a bare stipulation of facts." 383 F.2d at 777. Moreover, even if invalidity is not apparent because on its face the clause seems to comply with Sec. 8(e), an "as applied" violation may surface after more detailed factual development. Building Material & Constr. Teamsters Union Local No. 216 v. N.L.R.B., 520 F.2d 172 (D.C.Cir.1975).
 
 
 35
 We are persuaded that the prohibited secondary objective is not revealed by the language of the collective bargaining agreement here, and further inquiry is necessary. Some preliminary observations are in order.
 
 
 36
 First, nothing in the clause operates to the economic disadvantage of a non-union producer in selling his coal to nonsignatories. Those relationships are not affected.[5]
 
 
 37
 Second, the amount of the "contribution", "tax", or "penalty", as the parties have chosen to call the exaction payable by the signatory, is the same whether the coal is purchased or produced. On its face this appears to make the payment non-discriminatory and thus an equal burden on both union and non-union producers. On reflection, it may be appreciated that if the non-union producer pays into an independent retirement and benefit fund for his workers, the clause will impose an additional indirect burden on each ton of coal from which the employees of the non-union producers receive no benefit.
 
 
 38
 Third, if the non-union operator's labor costs are lower than a signatory's by an amount greater than the "tax" or "penalty," then he has not been put at a competitive disadvantage with coal produced in a union mine. In this instance, therefore, although the non-union operator cannot offer as attractive a price to a signatory, it would still be better than that which could be presented by another signatory.
 
 
 39
 Fourth, if the gap between a non-union producer's and a signatory's labor costs is less than the amount of the "penalty," then the differential might create pressure to become a signatory and thus avoid the burden of the "double payment" for employee health and retirement benefits.
 
 
 40
 Fifth, if the coal purchased is not the kind the signatory has the ability to mine,[6] questions arise about whether traditional work of the bargaining unit is at risk, the criterion that justifies the legality of work preservation rules. See, e.g., Building Material & Constr. Teamsters Union Local No. 216 v. N.L.R.B., 520 F.2d 172 (D.C.Cir.1975).
 
 
 41
 Sixth, by emphasizing that the exaction is due when it has not previously been paid, the trustees may use the clause to recover from a conscientious signatory purchaser past due amounts attributable to a delinquent producer. In that situation, the provision may be used for the prohibited ulterior union purpose of "bill collecting" by the trustees. See Griffith Company v. NLRB, 545 F.2d 1194 (9th Cir.1977).
 
 
 42
 These factors are variables which may be present in some cases but not in others. Indeed, some of the signatories are preparers who produce no coal of their own and whose own employees' income has no relationship to the source from which the coal is secured. The effects of this particular clause will not be uniform and the primary-secondary distinction so important to the resolution of Sec. 8(e) liability is dependent on them.
 
 
 43
 None of these matters have been resolved on this record. The trustees and the union submitted evidence in the district court that, by and large, the gap between the labor cost of signatories and non-union producers exceeds the amount of the purchased-coal clause exaction. That fact, however, has not been conceded by the signatories nor judicially established.[7] The other variables that we have listed also require development, as they apply in a particular case.
 
 
 44
 In some instances, the use of the clause will not be an inducement to a non-union producer to join the union but may make it less desirable for a signatory to supply its customers with purchased rather than produced coal. In other situations, the economic factors may combine to exert substantial pressure on a non-union producer to recognize the union.[8] There may be other factual settings in which none of the justifications for work preservation or union standards exist, and only secondary pressures are present. For these reasons, the signatories are in error in pressing for a "per se" or facial test, rather than an "as applied" rationale. As we see it, this is not an "all or nothing" situation.
 
 
 45
 The signatory employers rely heavily on Riverton Coal Co. v. UMW, 453 F.2d 1035 (6th Cir.), cert. denied, 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690 (1972), but in part that decision is actually contrary to their position of facial invalidity. In that case, the district court found on the basis of the evidence presented at trial, that the union designed the 80-cent clause so that the signatory, Riverton Coal, would pressure its affiliates to recognize the UMW. Accordingly, the secondary purpose was established. To that extent, the Riverton decision is not inconsistent with the rationale we adopt here.[9]
 
 
 46
 In sum, we believe that the legality of the clause must be decided on the facts applicable to each signatory. Kaiser Steel v. Mullins points the way in holding that a signatory may raise the defense of illegality in a suit for contributions by the trustee.
 
 
 47
 It bears mentioning that the obligation to make contributions is that of each individual signatory. It is not disputed that the Fund's auditors require each signatory to segregate contributions for purchased coal from the amount due on its own production. Since the collections are on an individual signatory basis, the validity of those contributions may likewise be determined on the circumstances present in each case. We recognize that there may be differing results as well when a signatory purchases from several sources and therefore careful accounting may be required. This may be a burden for both signatories and the trustees but we believe that some general standards may be developed with experience. Consideration of the various concerns we have listed will necessarily focus on the interests of the employees of the individual signatory and not those of all other signatories.[10]
 
 
 48
 Consequently, whether the clause is valid as a surrogate union standards or work preservation clause, or whether it contravenes Sec. 8(e) as a union signatory clause must depend on individualized fact finding. Because that was not done in this case, the summary judgment must be vacated.
 
 
 49
 The outcome of the individual cases may moot the antitrust claims. We therefore do not meet those issues.
 
 
 50
 Accordingly, the judgments of the district court will be vacated and the cases will be remanded for proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Anne E. Thompson, United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 The opinion of the district court is reported at 580 F.Supp. 670 (W.D.Pa.1984)
 
 
 [2]
 "... each signatory Employer engaged in the production of coal shall contribute to the Trusts ... the amounts specified below based on cents per ton on each ton of ... bituminous coal produced by such Employer for use or sale...." Article XX(d)(1)
 
 
 [3]
 The parties draw the distinction in this case between signatories and non-signatories. However, not all non-signatories are non-union. Nevertheless, we shall on occasion refer to all non-signatories as non-union
 
 
 [4]
 For example, the fact that work preservation aims are not apparent from a reading of the provisions does not establish that they are or are not present. The inability to discern this purpose from the clause itself does not make it violative of Sec. 8(e)
 
 
 [5]
 Of course, that might not be true if a traditional union standards clause were in effect. If the non-union producer raises wage rates to union levels so that business may be done with signatories, the additional labor cost would influence prices in sales to non-signatory buyers as well
 
 
 [6]
 The industry distinguishes between "supplemental" coal which differs from the grade, type, and quality an operator produces, and "substitute" coal. The latter is the equivalent of produced coal and may be sold in its place. The work preservation justification may differ in the two situations. See Lewis v. NLRB, 350 F.2d 801, 802 (D.C.Cir.1965)
 
 
 [7]
 In Kaiser Steel v. Mullins, the Supreme Court noted the non-signatory's contention that its employees' wages and benefits were equal or superior to those of the United Mine Workers. In that circumstance, as the Court noted, a non-UMW employer would be required to lower its price in order to be competitive with a UMW producer when the purchased coal clause was applied. It is in that context that the Court observed that if the clause is illegal, "it is because of the financial burden which the agreement attached to purchase of coal from non-UMW producers even though they may have contributed to other employee welfare funds." 455 U.S. at 79, 102 S.Ct. at 857
 
 
 [8]
 The method used to calculate the differential must insure that the non-union operator is not penalized for greater productivity. For example, to avoid a disadvantage to an efficient producer, the time it takes the union miner to produce one ton of coal may be assumed to be the production rate of both the parties. When that rate per hour is multiplied by the actual hourly labor costs of the union and non-union producers the two resulting labor costs per ton are compared to measure the "gap."
 If as the union contends the "gap" is greater than the tax, the purchased-coal clause operates to affect only the labor costs and more importantly only to the extent that the non-union scale is below union standards. Conversely, if the tax is greater than the gap, the clause is impermissible because the wage differential has been exceeded.
 If a non-union mine is less efficient, each operator's labor cost per ton could be calculated by using the time it actually takes the union and non-union miner to produce one ton. Comparing actual costs per ton is necessary because to lower the union operator's production to that of the non-union operator would increase the gap based on the inefficiency of the non-union operator, a result the union has disclaimed and which serves no legitimate purpose under Sec. 8(e).
 We do not mandate the use of these formulas but simply point out that they are examples of methods which may be used to meet the objective of relating labor costs to the per ton fund contribution to demonstrate the economic effect of the purchased-coal clause.
 
 
 [9]
 We are not persuaded by the dictum in that case that no primary objective had been shown because Riverton could comply with the clause by shutting down its mines and supplying its customers only with purchased coal. That same rationale would apply to a valid union standards clause
 
 
 [10]
 On this basis, also, the uneasiness expressed by the district court--that the work preservation aspects of the clause are not limited to the individual employees--is dissipated