

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-13-2003

# Spectacor Mgt Grp v. NLRB

Precedential or Non-Precedential: Precedential

Docket 01-3644

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Spectacor Mgt Grp v. NLRB" (2003). *2003 Decisions.* Paper 778.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/778

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed February 13, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3644

SPECTACOR MANAGEMENT GROUP,
         Petitioner

v.

NATIONAL LABOR RELATIONS BOARD,
         Respondent

ATLANTIC EXPOSITION SERVICES, INC.,
         Intervenor

No. 01-3694

SOUTH JERSEY REGIONAL COUNCIL OF CARPENTERS,
LOCAL 623 AFFILIATED WITH THE UNITED
BROTHERHOOD OF CARPENTERS AND JOINERS OF
AMERICA, AFL-CIO
         Petitioner

v.

NATIONAL LABOR RELATIONS BOARD,
         Respondent

ATLANTIC EXPOSITION SERVICES, INC.,
         Intervenor

No. 01-4036

NATIONAL LABOR RELATIONS BOARD,
         Petitioner

v.

SPECTACOR MANAGEMENT GROUP; SOUTH JERSEY
REGIONAL COUNCIL OF CARPENTERS, LOCAL 623,
AFFILIATED WITH THE UNITED BROTHERHOOD OF
CARPENTERS AND JOINERS OF AMERICA, AFL-CIO,
         Respondents

ATLANTIC EXPOSITION SERVICES, INC.,
         Intervenor

On Petition for Review and Cross-Application for
Enforcement of an Order and Decision of the
National Labor Relations Board
(4-CE-116-1)

Argued: October 29, 2002

Before: SLOVITER, FUENTES, Circuit Judges,
and DEBEVOISE,* District Judge

(Filed: February 13, 2003)

James A. Matthews, III (Argued)
Jessica L. Pollock
Fox, Rothschild, O'Brien & Frankel
Philadelphia, PA 19103

 Attorneys for Petitioner Spectacor
Management Group, No. 01-3644,
Respondent Spectacor
Management Group, No. 01-4036

_____

* The Hon. Dickinson R. Debevoise, Senior Judge, United States District
Court for the District of New Jersey, sitting by designation.

                            2

James Katz (Argued)
Howard S. Simonoff
Sagot, Jennings & Sigmond
Cherry Hill, N.J. 08034

 Attorneys for Petitioner Local 623,
No. 01-3694, Respondent Local
623, No. 01-4036

Arthur F. Rosenfeld
 General Counsel
John E. Higgins, Jr.,
 Deputy General Counsel
John H. Ferguson
 Associate General Counsel
Aileen A. Armstrong
 Deputy Associate General Counsel
Robert J. Englehart
 Supervisory Attorney
James M. Oleske, Jr. (Argued)
National Labor Relations Board
Washington, D.C. 20570

 Attorneys for Petitioner NLRB,
No. 01-4036, Respondent NLRB,
Nos. 01-3644, 01-3694

James J. Rodgers
Dilworth, Paxson
Philadelphia, PA 19103

Howard K. Trubman
Sobol & Trubman
Philadelphia, PA 19103

 Attorneys for Intervenor Atlantic

Exposition Services, Inc., Nos.
01-3644, 01-3694, 01-4036

Brian F. Quinn
DeCarlo, Connor & Selvo
Washington, DC 20001

Attorney for United Brotherhood
of Carpenters and Joiners,
Amicus-Appellant, No. 01-3644

James M. Walters
John M. Capron
Fisher & Phillips
Atlanta, GA 30326

Attorneys for GES Exposition,
Amicus-Appellant, Nos. 01-3644,
01-3694, Amicus-Appellee,
No. 01-4036

OPINION OF THE COURT

SLOVITER, Circuit Judge:

At issue in this case is whether it was reasonable for the National Labor Relations Board ("NLRB" or "Board") to find that S 8(e) of the National Labor Relations Act ("Act"), 29 U.S.C. S 158(e), was violated by (1) an agreement between the Union and the company managing a convention center that provides that the installation, assembly and dismantling of temporary tradeshow exhibits would be subcontracted only to companies that hired Union members and (2) to find that such work was not protected by the construction industry proviso of S 8(e). All parties agree that the latter issue is one of first impression.

I.

INTRODUCTION

Spectacor Management Group ("SMG") and the South Jersey Regional Council of Carpenters, Local 623 ("Union") (collectively "Petitioners") petition this court for review of the order and decision of the NLRB finding that an

agreement entered into and enforced by Petitioners violated S 8(e) of the National Labor Relations Act ("Act"). The agreement, which precluded SMG from subcontracting trade show work to employers who did not have collective bargaining agreements with the Union, was enforced against Atlantic Exposition Services, Inc. ("AES"), the original Charging Party and Intervenor here.

The Administrative Law Judge ("ALJ") ruled against the Petitioners. On appeal, the Board approved the ALJ's finding that the agreement violated S 8(e). The Board agreed that the "agreement lacked a work preservation objective, that the work covered by the agreement was not performed on a construction site, and therefore that the agreement was not protected by the construction industry proviso." Decision & Order at 1, 335 NLRB No. 49 (2001). As a result, the Board adopted the recommended order of the ALJ which, in relevant part, directed the parties to cease and desist from maintaining and enforcing their subcontracting agreement.

The Petitioners attack the Board's decision on both grounds. Primarily, Petitioners argue that trade show work at the Atlantic City Convention Center constitutes construction work at a construction site, thereby entitling their agreement to the protection of the construction industry proviso. Alternatively, Petitioners argue that the agreement was not illegal because it fell within the work preservation doctrine, in that it served the primary purpose of preserving the Union's work at the Convention Center rather than unlawfully sought to secondarily influence labor relations of other employers. The Union also argues that the agreement did not violate the Act as it failed to disrupt or change the way AES conducted business with SMG.

Congress has not spoken on whether a trade show floor constitutes a construction site for purposes of the construction industry proviso, and neither the Board nor any court has hitherto determined the issue. Given the deference that we owe the Board on issues within its purview, we will accept its determination.

II.

FACTS AND PROCEDURAL BACKGROUND

A.

Some background of the current dispute is necessary to appreciate the issue. Between 1983 and 1995, the Atlantic City Convention Center Authority ("ACCCA") operated and managed the Convention Center. The Union represented ACCCA employees who assembled and dismantled trade show exhibits. During this time, the collective bargaining agreements between ACCCA and the Union precluded ACCCA from subcontracting trade show work. In or before 1995, the New Jersey Sports and Exposition Authority became an owner of the Center and decided to manage it through SMG, a private management company.1 When SMG's predecessors managed the Convention Center, they directly hired members of the Union for trade show work.

SMG honored the terms of ACCCA's collective bargaining agreement. Show exhibitors contracted with SMG to provide

the labor to assemble and dismantle tradeshow exhibits. SMG, in turn, procured the appropriate labor force from the Union's hiring hall. In 1996, SMG sought to remove itself as the middleman between show exhibitors and laborers, leaving the direct employment of labor to subcontractors or tenants. Accordingly, it negotiated a new agreement with the Union that no longer prohibited subcontracting at the Convention Center. Instead, the Union and SMG agreed that trade show work traditionally performed through the Union's hiring hall could be subcontracted as long as Union workers continued as the sole providers of trade show labor under agreements reached between the subcontractors and the Union.

This agreement, incorporated in a letter dated April 15, 1996, stands at the center of the current dispute. It provides:

_____

1. SMG is a Pennsylvania joint venture which manages public assembly facilities, such as convention centers, on behalf of municipal partners.

> Trade employees who work on a part-time basis or who perform contracted work for SMG (e.g. "show" labor) will work under a Separate Agreement which will be negotiated as soon as is practicable. It is understood and agreed that the Separate Agreement will contain a provision stipulating that in the event SMG subcontracts the covered work, the covered work will be subcontracted to a firm which will . . . negotiate an agreement with the (Trade) Local having jurisdiction over that work with SMG. The said sub-contractor will be free to negotiate the terms and conditions of the said agreement and will not be bound by SMG's agreement(s) with the applicable local union.

Decision & Order at 3. No Separate Agreement as referred to above was negotiated but the parties proceeded to act as if the above paragraph was binding. If a subcontractor failed to reach its own agreement with the Union, it was required to obtain labor through the previous method where SMG played middleman, using Union labor.

AES, unlike many, if not all, of the other subcontractors at the Convention Center, did not sign an agreement with the Union but chose to use its own employees, members of the Painters Union. In 1998, as an AES employee was installing a tradeshow exhibit at the Center, he was ordered to stop working by a Union foreman. Thereafter, the SMG General Manager demanded that AES either use Union laborers or leave the Convention Center altogether. This current litigation ensued.

B.

On October 13, 1998, AES filed charges against the Union and SMG for refusing to allow AES to use its own

employees to do its tradeshow work at the Convention Center. The ALJ found that the Union and SMG had violated S 8(e) of the Act when they entered into and enforced the agreement that SMG would not subcontract work to employers who did not have collective-bargaining agreements with the Union. In so finding, the ALJ reasoned that the agreement did not have a valid work preservation purpose because it was "not limited to addressing the labor

7

relations of SMG vis-a-vis its own employees, but instead seeks to regulate the labor policies of other, neutral employers by requiring them to have agreements with the Carpenters, an objective that is clearly secondary." Decision & Order at 4. The ALJ also rejected the Petitioners' defense that the work involved in trade shows was protected by the construction industry proviso to S 8(e). The ALJ held that SMG was not an employer in the construction industry. He further concluded that the construction industry proviso to S 8(e) was not applicable because the work in question was not "associated with building a structure" and was not being performed at " 'the site of the construction, alteration, painting, or repair of a building, structure or other work' as Section 8(e) requires." Id. at 9.

In a brief Decision and Order entered August 27, 2001, a unanimous three member panel of the Board affirmed the ALJ's finding that the "agreement lacked a work preservation objective, that the work covered by the agreement was not performed on a construction site, and therefore that the agreement was not protected by the construction industry proviso." Decision & Order at 1. The Board did not reach and did not decide the ALJ's conclusion that SMG was not an employer in the construction industry.

Shortly thereafter, SMG and the Union filed Petitions for Review in this court. The Board filed a Cross-Application for Enforcement. AES intervened in support of the Board. The United Brotherhood of Carpenters and Joiners and GES Exposition Services filed briefs as amici curiae.

III.

DISCUSSION

A. Jurisdiction and Standard of Review

We have jurisdiction to review final orders of the National Labor Relations Board pursuant to Section 10(e) and (f) of the Act. 29 U.S.C. SS 160(e) and (f). We accept the Board's factual findings if they are supported by substantial evidence. We exercise plenary review over questions of law

8

and the Board's application of legal precepts. NLRB v.

Attleboro Associates, Ltd., 176 F.3d 154, 160 (3d Cir. 1999).
For the Board to prevail, "it need not show its construction
is the best way to read the statute;" rather we must respect
the Board's judgment as long as it is reasonable. Holly
Farms Corp. v. NLRB, 517 U.S. 392, 409 (1996) (emphasis
in original).

B. Section 8(e) and the Work Preservation Doctrine

At oral argument, the Union conceded that its agreement
with SMG would be illegal under S 8(e) were it not entitled
to the protection of the construction industry proviso. Tr. of
Oral Argument, Oct. 29, 2002, at 4. However, in their briefs
the Petitioners press the argument that their agreement is
not proscribed by S 8(e). In doing so, they invoke the work
preservation doctrine.2 Notwithstanding the Union's
concession, it is important that we consider whether the
Union/SMG agreement falls within the proscription ofS 8(e)
as that was the predicate for the decisions of both the
Board and the ALJ.

Section 8(e), which was added to the Act by the 1959
Landrum-Griffin Act, provides:

> It shall be an unfair labor practice for any labor
> organization and any employer to enter into any
> contract or agreement, express or implied, whereby
> such employer ceases or refrains or agrees to cease or
> refrain from handling, using, selling, transporting or
> otherwise dealing in any of the products of any other
> employer, or to cease doing business with any other
> person, and any contract or agreement entered into

---

2. The Union's argument that the Board erred as a matter of law in
concluding that it violated S 8(e) because the agreement did not result in
disruption or cessation of AES's existing business relationship with SMG
or change the way AES had been doing business at the Center before the
agreement, is satisfactorily answered by the Board's earlier decision that
"[t]he cease-doing business element of Sec. 8(e) is satisfied by proof of
prohibitions against forming business relationships in the first place as
well as requirements that one cease business relationships already in
existence." Northeast Ohio Dist. Council of Carpenters (Alessio
Construction), 310 NLRB 1023, 1025 n.9 (1993).

9

> heretofore or hereafter containing such an agreement
> shall be to such extent unenforcible and void.

29 U.S.C. S158(e).

It is apparent that the literal language of the SMG/Union
agreement comes clearly within the prohibition ofS 8(e) of
the Act. In National Woodwork Mfrs. Ass'n v. NLRB, 386
U.S. 612 (1967), the Supreme Court explained thatS 8(e)
was designed to invalidate so-called "hot cargo" clauses, or
agreements between a union and an employer whereby the
employer agrees not to deal with other employers with

whom the union either has a labor dispute or who it deems to be unfair to organized labor. Id. at 634-37. Looking to the legislative history of S 8(e), the Supreme Court interpreted the section to invalidate only those contract clauses with secondary objectives, while those with a primary purpose, such as work preservation, remained lawful. See id. at 637-645. If the purpose of the agreement is to benefit the employees of the bargaining unit, the agreement is primary and thus lawful, but if its aim is to pressure outside employers to concede to union objectives, the agreement is unlawfully secondary. In re Bituminous Coal Wage Agreements, 756 F.2d 284, 289 (3d Cir. 1985). As the Supreme Court stated in an oft-repeated sentence, "the touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-a-vis his own employees." National Woodwork, 386 U.S. at 645.

The Supreme Court further stated that a lawful work preservation agreement must pass two tests. First, the agreement must seek to preserve work traditionally performed by employees represented by the union. Second, the contracting employer must have the power to give the employees the work in question, which is known as the "right of control" test. NLRB v. Int'l Longshoremen's Ass'n, 447 U.S. 490, 504 (1980) ("ILA I"). The rationale is that if the contracting employer does not have the power to assign the work, it is reasonable to infer that the agreement has the secondary objective to influence the person or entity that has such power. Id. at 504-05.

In the case before us, the ALJ, in reasoning adopted by

10

the Board, found the agreement to be unlawfully secondary in nature because it "was not intended to preserve work but was intended to satisfy the union's objectives elsewhere." Decision & Order at 4. The ALJ found that the SMG/Union agreement violated National Woodwork's touchstone as it was not limited to SMG's labor relations vis-a-vis its own employees but sought to regulate the labor policies of other neutral employers (subcontractors, such as AES) by requiring them to contract with the Union, an unlawful secondary objective. SMG had removed itself from the role of employer when it began subcontracting, and accordingly the Union workers were no longer SMG employees. Adding support to the ALJ's finding that the agreement sought to regulate other employers' labor policies was the fact that the Union rejected AES' offer to contract with it for work done at the Convention Center but insisted that AES also enter an agreement that covered seven counties in southern New Jersey.3

Petitioners argue that because SMG manages the Convention Center, it exercises control over the work conducted there. However, SMG's agreement with the Union, which removed SMG from the role of employer by allowing it to subcontract, eliminated SMG's ability to "give

the employees the work in question." ILA I , 447 U.S. at 504. The agreement forced the subcontractors to negotiate their own agreements with the Union, thereby giving these subcontractors the power to assign employees the work in question, namely installing, assembling and dismantling trade show exhibits. It is therefore apparent that the SMG/Union agreement did not satisfy the work preservation doctrine's touchstone as it was not limited to labor relations of SMG vis-a-vis its own employees. Instead, the SMG/Union agreement plainly affects the labor relations of employers other than SMG.

In its oral argument, SMG argued that even though it

_____

3. Those subcontractors who signed agreements with the Union received significant benefits, such as the elimination of double time on weekends, elimination of nonworking personnel, and revised jurisdictional lines allowing the subcontractors to use cheaper employees represented by another union on certain jobs.

had subcontracted trade show work, it retained the right directly to employ Union members when the show promoter opted to hire a subcontractor who did not have a contract with the Union (a nonsignatory employer). SMG stated that because it could hire and supervise Union members and provide them to the contractor, it should be treated as the direct employer. However, SMG was unable to provide the court with any estimate as to how often this situation arose and it produced no records in that connection. Tr. of Oral Argument, Oct. 29, 2002, at 17. Assuming the existence of some such situations, we fail to see why it would undercut the ALJ's determination that the SMG/Union agreement falls precisely within the prohibition of S 8(e) as that agreement requires neutral employers to contract with the Union.

Reiterating its argument based on the work preservation doctrine, the Union emphasizes that it has provided trade show exhibition work at the Convention Center for decades, and its agreement with SMG merely seeks to preserve the Union's historical work at that venue. This argument fails for two reasons. First, it completely avoids the "touchstone" of the work preservation doctrine because it does not even attempt to challenge the ALJ's critical finding that the agreement was not limited to labor relations of SMG vis-a-vis SMG's own employees. Second, the Union fails to justify its efforts to use the agreement covering the Center to expand its reach into seven other counties.

In contrast to the Union, SMG glides quickly over the work preservation argument and largely relies on the Union's brief on this issue. Nonetheless, SMG distances itself from the Union by arguing that if a violation of S 8(e) did occur, it was limited to an as-applied violation by the Union in its dealings with AES. SMG's position is not persuasive. We have made clear that hot cargo clauses may

be invalid per se if the provision is " 'secondary in [its] purpose as well as [its] result.' " In re Bituminous Coal Wage Agreements, 756 F.2d at 290 (quoting A. Duie Pyle, Inc. v. N.L.R.B., 383 F.2d 772, 777 (3d Cir. 1967)). This per se violation becomes apparent when the clause's " 'necessary effect is to make the continuance of the relationship between the [signatory] employer and an independent

contractor depend on the latter's decision to become a member of the union.' " Id. The SMG/Union agreement fits this description precisely as SMG, the signatory employer, could not subcontract to an independent contractor unless that contractor first contracted with the Union. The violation of S 8(e) was not limited to AES but was generally applicable and therefore is per se invalid. Accordingly, there is ample basis to support the Board's determination that the agreement violated S 8(e) of the Act.

C. The Construction Industry Proviso of Section 8(e)

The Petitioners place most, if not all, of their emphasis on the contention that their agreement is not in violation of the Act because it receives the protection of the "construction industry proviso" to Section 8(e). The proviso states:

> [N]othing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure or other work.

29 U.S.C. S 158(e). There is a dearth of applicable case law that could help interpret the meaning and scope of the proviso.

There are three phrases in the proviso to be considered in this case: The protected agreement must be between a union and (1) an employer in the construction industry; (2) it must relate to work to be done at the site; (3) of the construction, alteration, painting, or repair of building, structure or other work. As to (1) above, the ALJ held that SMG was not an "employer in the construction industry," Decision & Order at 10, but the Board, having found that S 8(e) was violated on another basis, did not decide that issue or the subsidiary question whether it possessed relevant control over labor relations.

The Petitioners argue that the Board could not reach the "construction site" issue without first deciding whether SMG was an employer in the construction industry because SMG's counsel explained at oral argument that the "employer in the construction industry" comes first in the

statutory language. Tr. of Oral Argument, Oct. 29, 2002, at 21. We decline to pursue a "chicken or the egg first" argument. The construction industry proviso is inapplicable if either the employer is not in the construction industry or the site is not a construction site. The ALJ decided both adversely to the Petitioners. The Board chose to limit its focus on the construction site. It was free to do so.

Instead, the ALJ found, and the Board agreed, that trade show floors do not constitute construction sites. In challenging this conclusion, the Union focuses on the ALJ's statement that some work of skilled carpenters is needed and performed at the Convention Center, although the amount remains in question. The ALJ further stated that "[t]he work at trade shows requires the same sorts of skills, utilizes the same sorts of materials, and involves the same sorts of tools as traditional, recognized construction work. It is the kind of work, with the kind of skills, that, if performed at a construction project and as a component of that construction, might be exempt under the proviso." Decision & Order at 8.

Other similarities, noted by the ALJ and emphasized by Petitioners, are that "the assignment process is through a hiring hall, the majority of jobs are of short duration, and carpenters who work trade shows are employed by a number of employers." Id. at 8-9. The ALJ noted that "there are normally at least two groups of employees working at the Center to set up and break down trade shows, employees represented by the Painters [with whom AES had a contract] and the Carpenters [the Union with which SMG made the agreement]." Id. at 9.

Despite the similarities between some trade show work and traditional construction work, the ALJ focused on the requirement in the proviso that "the agreement must apply only to work 'to be done at the site.' " Id. The ALJ stated: "The Center would not be referred to as a construction project, in the sense that appears in the legislative history or in the Supreme Court's decision in Woelke & Romero Framing. No occupancy inspections occur and neither construction nor zoning permits are required. Hard hats are not worn, and safety boots are not required." Id. (footnote omitted). The ALJ summarized his discussion by stating

14

that "the Center is an exhibition hall typically used to display items for sale. The Center is not the subject of construction or building." Id.

Having found that a trade show floor did not qualify as a construction site, the ALJ determined that the agreement did not fit within the proviso. Id. ("whatever work is performed by the Carpenters on the floor of the Center is not being performed at 'the site of the construction.' "). The Board expressly approved, as it too stated "that the work covered by the agreement was not performed on a construction site." Id. at 1. The Petitioners argue that the

statutory words "at the site" do not exclude remote job sites. However, in Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 654-62 (1982), the Supreme Court speaks of the proviso only in terms of a "construction site," and there is no basis to extend "site" beyond the statutory context of the phrase.

Most of Petitioners' fire is reserved for the interpretation applied to the third, and inextricably related, requirement, that the site be "of the construction, alteration, painting, or repair of a building, structure or other work." The word "construction" was interpreted by the Board for purposes of S 8(f) of the Act (the provision allowing pre-hire agreements under certain circumstances) in its decision in Carpet, Linoleum and Soft Tile Local Union No. 1247, 156 NLRB 951 (1966) (Indio Paint). In that decision, the Board carefully parsed technical, common, and legal definitions of the word "construction" as found in Construction Review (a 1957 joint publication of the U.S. Departments of Labor and Commerce), the Standard Industrial Classification Manual, and Mechanics Lien Law respectively. Amalgamating the various definitions, the Board defined "building and construction" as "the provision of labor whereby materials and constituent parts may be combined on the building site to form, make or build a structure." Id. at 959. Using this definition, the Board held that the provision of labor and materials for floor covering installations constitutes building and construction work. Id. The Indio Paint definition is significant because the parties agree that the Board uses the same standard for "construction" in SS 8(e) and (f) cases.

15

Upon examining the proviso's legislative history, the Supreme Court determined that Congress wished to " 'preserve the status quo' " regarding agreements between unions and contractors in the construction industry. Woelke & Romero Framing, 456 U.S. at 657 (quoting National Woodwork, 386 U.S. at 637). According to the Board, that preservation applies to the status quo in the industry as of 1959, the year Congress enacted S 8(e). Alessio Construction, 310 NLRB 1023, 1027 (1993). For this reason, there is a historical basis for the focus by the General Counsel of the Board on permanency, as the Departments of Labor and Commerce's 1957 Construction Review defines buildings or structures for construction purposes as work "built into or affixed to the land." Br. of Bd. at 32.

In his brief for the Board, the General Counsel argues that "structure" is the critical word in the Board's standard enunciated in Indio Paint and that such structure excludes trade show exhibits. Br. of Bd. at 27. He notes that the Board has never treated as a construction site a location where the work provided did not involve building or affixing to the land.4 Trade show exhibits, certainly the ones in

4. In its Reply Brief the Union states that if "construction" is limited to something "built into or affixed to the land" numerous activities previously considered construction work would no longer be covered. The three cases cited by the Union disprove its argument. In International Union of Operating Engineers, Local Union No. 12 (Tri-Counties), 131 NLRB 520 (1961), the construction at issue was of streets, sewers, gutters, and utility installations. It is difficult to imagine construction of items more built into or affixed to the land. In Ohio Valley District Council (Zidell Explorations), 175 NLRB 887 (1969), the work involved dismantling of ballistic missile sites, which speaks for itself. In U.S. Abatement, Inc., 303 NLRB 451 (1991), the work considered "construction" was the removal of asbestos, and the Board itself said, "[i]t is evident that the asbestos removal activities in which Respondent is engaged affect the structure of buildings and equipment, such as boilers and pipes, which, after installation, have become an integral part of the structure, itself." Id. at 456. Finally, in SMG's Reply Brief, it contends that the Board's intervening decision in Freeman Decorating Co., 336 NLRB No. 1 (2001), is inconsistent with its decision in the current case. SMG's argument is unpersuasive. In Freeman Decorating, the Board never reached the "construction" question of the S 8(f) issue

16

question, are not built into or affixed to the land; the only building associated with this dispute is the Convention Center. Thus, the Board's brief argues that because the Center is not being constructed or altered, it is not a construction site.

In an analysis that Petitioners vigorously attack, the ALJ distinguished the earlier Board decisions that held that the construction of a retail store fell within S 8(e)'s proviso on the ground that the employer in those cases "was involved in the construction of a building, something tangible and permanent, even installing carpeting." Decision & Order at 8. The Petitioners complain that in interpreting the language of the proviso to require some permanence to the structure, the ALJ and the Board have added a requirement Congress never intended. We do not agree. The contemporary references cited by the ALJ define construction in terms of structures being "built into or affixed" to the land, which necessarily excludes temporary trade show work. Decision & Order at 9.

The Petitioners suggest that there is no statutory basis for the Board's requirement for a structure. They criticize the Board for ignoring the words "other work" in the proviso while focusing on "site of construction." Br. of Union at 39. However, the Petitioners provide no decisions in which the Board or any court discusses "other work." In such a situation, the General Counsel is not unreasonable in referring to the maxim that "a word is known by the company it keeps." Br. of Bd. at 31.

The Union supports its position by reference to what some courts have deemed to be the legislative intent behind the proviso, which is minimizing jobsite tension within the construction industry. Br. of Union at 37 (citing Milwaukee & Southeast Wis. Dist. Council of Carpenters v. Rowley-

Schlimgen, 2 F.3d 765, 767 (7th Cir. 1993)). The Union

_____

before it, and thus the ALJ's discussion of the erection and dismantling of exposition shows in that case was dicta. Petitioners concede as much. That dicta, articulated by an administrative law judge and not addressed by the Board on review, does not render the Board's determination in this case unreasonable.

17

then states that because having different groups at the Center causes friction, it would be arbitrary not to conclude that the Convention Center is a requisite location for application of the proviso. Br. of Union at 38. However, as the Supreme Court said in Woelke & Romero Framing, the proviso was "only partly concerned with jobsite friction." 456 U.S. at 662. Instead, the Woelke Court found that Congress was more concerned with preserving the"status quo" in the construction industry. Id. at 657. The Board has concluded that under established principles of statutory construction, the construction industry proviso "should not be given an expansive reading" but should protect only " 'those subjects expressly exempted by the proviso.' " Operating Engineers Local 520 (Massman Construction), 327 NLRB 1257, 1257-58 (1999) (quoting Alessio Construction, 310 NLRB 1023, 1029 (1993)). The Board's interpretation of the proviso as limited to more traditional notions of construction appears to be consistent with that principle and Congress' purpose.

We are presented with two vastly different interpretations of the construction industry proviso. Under the ALJ's and Board's interpretation of the proviso, the proviso covers, and is limited to, traditional construction sites, such as building homes, offices, and similar relatively permanent structures. Under the interpretation of construction site proffered by the Petitioners, any location where installing, assembling and disassembling occurs feasibly could fit within the construction industry proviso, ranging from construction of intricate movie sets to platforms at malls for performers and the appearance of Santa Claus. Petitioners have produced no evidence that Congress envisioned that movie set builders and the like would fall within the construction industry proviso.

Under the circumstances, where the United States Supreme Court, this court, and no other federal appellate court has addressed the issue of the application of the construction industry proviso to the installing and dismantling of trade show exhibits, we believe it is appropriate to defer to the reasonable statutory interpretation of the Board, the agency primarily charged with the Act's implementation and administration. See

18

Meyer v. Holley, No. 01-1120, slip op. at 7 (U.S. Jan. 22,

2003); Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45 (1984). 5 We will therefore deny the Petition for Review and grant the Board's cross-application for enforcement.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

---

5. One of the amici, the United Brotherhood of Carpenters and Joiners of America ("UBC"), urges that if we affirm the Board, we limit the Board's decision to the facts of the current case, and adopt a case-by-case, totality of circumstances approach without drawing a broad rule that trade show work does not fall within the construction industry proviso. See Br. of UBC at 5. It will be up to the Board to determine the applicability of its interpretation of the construction industry proviso in different circumstances.